# IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSE CABRAL,

                  Plaintiff

v.

                             :        Civil Action No. 02-cv-2806

THE PHILADELPHIA
COCA-COLA BOTTLING COMPANY,

                  Defendant.

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Defendant The Philadelphia Coca-Cola Bottling Company ("Philadelphia Coca-Cola" or "the Company"), by its undersigned counsel, submits this Memorandum of Law in support of its Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.    INTRODUCTION

Plaintiff Jose Cabral ("Cabral") brought the instant action alleging that his current employer, Philadelphia Coca-Cola, has discriminated against him because he is Hispanic by exposing him to a hostile work environment and by giving him less favorable driver route assignments.[1] Cabral also alleges that the Company retaliated against him by granting him non-

---

[1]    Cabral purports to bring the action on behalf of himself and those similarly situated. Although styled as a class action, Cabral's claims are unique to him and the case is therefore more appropriately considered an individual action.  The Company's arguments concerning why Cabral may not represent a class of Company employees will be set forth in detail in its Opposition to Class Certification, should Cabral attempt to certify a class.

Additionally, Cabral has styled his own claim as one of race discrimination.  However, in reality, it relates to his national origin, and it is referred to as such herein.

FMLA unpaid leave instead of the FMLA unpaid leave that he requested and by terminating him

after he submitted a falsified note from his dentist indicating that he was out of work due to

periodontal surgery, when in reality he was in Florida visiting relatives.  On the basis of these

allegations, Cabral asserts claims for discrimination and retaliation under the Civil Rights Act of

1866, 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e, et seq. ("Title VII").

Summary judgment is appropriate as to each of Cabral's claims.  Cabral's

allegations of a hostile work environment fail because the comments and conduct that he

identified at his deposition were not because of Cabral's national origin and were not sufficiently

severe or pervasive so as to establish a valid hostile work environment claim.  Further, even if

Cabral could otherwise state such a claim, Philadelphia Coca-Cola could not be held liable

because Cabral never complained about the conduct despite the fact that the Company maintains

an anti-discrimination policy and complaint procedure that is set forth on postings within the

Moorestown facility and the fact that the collective bargaining agreement executed by the

Company and Teamsters, Local 676, Cabral's union, contains both anti-discrimination and

grievance and arbitration provisions.

Cabral's route assignment claim – that he was discriminatorily denied the

opportunity to drive his preferred route as often as he would have liked and instead was assigned

on those occasions to drive two comparable routes – fails because he suffered no tangible

adverse employment action.  Each of the three routes involved the same pay, hours and type of

work.  Additionally, even if the Company's assignment of routes constitutes a tangible

employment action, Cabral's claim would still fail because there is no evidence that the

legitimate, non-discriminatory reasons proffered by the Company for assigning routes – that such

assignments were based on business need, driver availability and other business factors – were pretextual.

Finally, Cabral's retaliation claim fails because there is simply no evidence of a causal connection between Cabral having filed an EEOC Charge and the Company's decisions (a) to classify Cabral's request for unpaid leave as non-FMLA leave and (b) to terminate him for dishonesty after he submitted a falsified dentist's note.  Nor is there any evidence that the Company's articulated reasons for these decisions were pretextual.  Indeed, Cabral admits that he knew the dentist's note to be false when he submitted it to the Company.  Further, Cabral cannot be heard to complain about the Company's refusal to grant him FMLA leave because Cabral did not qualify for such leave and, at any rate, was given and took the week off that he requested.

II.    **STATEMENT OF MATERIAL FACTS**[2]

A.    **Cabral's Work History with Philadelphia Coca-Cola**

Philadelphia Coca-Cola is in the business of bottling, merchandising, and delivering Coca-Cola licensed beverage products.  Cabral was hired by Philadelphia Coca-Cola in or about August 1996 to work in its bottling and warehousing facility in Moorestown, New Jersey as a transport driver.[3]  (Exhibit 1, Complaint ¶ 32)[4]  Except as discussed below, Cabral has been employed by the Company as a transport driver at all times since his hiring into that position and remains employed by the Company as a transport driver today.  (Exhibit 2,

---

[2]    Consistent with the standard employed by the Court in reviewing dispositive motions, Philadelphia Coca-Cola admits the facts set forth herein only for purposes of this Motion.

[3]    Transport drivers are also referred to at the Company and in the deposition transcripts submitted herewith as haulage drivers.

[4]    Unless otherwise indicated, the exhibits referenced herein are attached to the Declaration of David J. Woolf, which is filed contemporaneously herewith.

Transcript of the November 20, 2002 Deposition of Jose Cabral, hereinafter "Cabral Tr.", at 16)

As a transport driver, Cabral is responsible for driving a tractor-trailer from Moorestown, New

Jersey to Marmora, New Jersey (the "Marmora route"); Philadelphia, Pennsylvania (the

"Philadelphia route"); and Langhorne, Pennsylvania (the "Langhorne route") on an as needed

and as assigned basis to pick up and deliver Company raw materials and finished product. (Exh.

2, Cabral Tr. at 16-17, 23, 62)

At all times during his employment with the Company, Cabral has been a member

of Teamsters, Local No. 676 ("Union"). (Id. at 16) The Union and Company were and are

parties to a collective bargaining agreement ("CBA") that governs the terms and conditions of

Cabral's employment with the Company. (Exhibit 3, Collective Bargaining Agreement effective

April 15, 1998; Exh. 2, Cabral Tr. at 16, 54-57). The CBA contains an anti-discrimination

provision that provides in relevant part:

> There shall be no discrimination by the EMPLOYER . . . against
> any employee because of his race, color, creed, sex, age or
> nationality, in the placement and retention of employment or in the
> hours, wages, or working conditions of the employees.

(Id. at 56-57 (emphasis in original)). The CBA also contains grievance and arbitration

provisions that give each employee access to a complaint resolution procedure in the event he or

she believes that the Company has violated any CBA provision, including the anti-discrimination

provision. (Exh. 3, CBA, at Art. VIII, p. 8-9)

Additionally, the Company maintains an anti-discrimination and anti-harassment

policy applicable to union employees. (Exhibit 4, Transcript of the November 12, 2002

Deposition of Tracee L. Hunt, hereinafter "Hunt Tr.", at 39-40) This policy is posted in each of

the Company's facilities, including the Moorestown facility. (Id. at 40; Exhibit 5, Transcript of

the November 12, 2002 Deposition of Luis Fonseca, hereinafter "Fonseca Tr.", at 31-32) The

Company also maintains an open door policy, pursuant to which any employee may speak with his supervisor or a human resources professional concerning any workplace issue or concern. (Exh. 2, Cabral Tr. at 51)

      B.      **Facts Material to Cabral's National Origin Discrimination and Retaliation Claims**

          1.      **Hostile Work Environment Claim**

On December 13, 2000, Cabral filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC Charge") alleging that Philadelphia Coca-Cola discriminated against him because he is Hispanic.  (Exh. 6, EEOC Charge) Subsequently, on August 23, 2002, he initiated the instant action by filing a complaint in Federal Court ("Complaint").  (Exh. 1, Complaint).  In the Complaint, Cabral alleges that he was subjected to a hostile work environment consisting of (a) the regular telling of  "racist jokes" and (b) a comment by Joe Ortlieb, his supervisor, that, "If you don't like it, go back where you came from."  (Exh. 1, Complaint at ¶¶ 32, 33).  With respect to the supposed racist jokes, Cabral testified that the jokes were told by his co-workers, but indicated that the jokes were not directed at him or Hispanics in general.  (Exh. 2, Cabral Tr. at 40-44, 64-65)  Cabral identified only two co-worker comments that were directed at Hispanics, both to the effect that Hispanics should not be paid as much as Caucasian employees.  (Id. at 65, 219)

Cabral testified that, his allegations in the Complaint notwithstanding, no managerial employees made any racist or Hispanic jokes or made statements that he perceived to be harassing, except for the "if you don't like it" comment (discussed below) and another alleged comment by Cabral's supervisor relating to Martin Luther King Day and the supervisor's view

that the drivers had too many holidays.[5]  (Id. at 30-32, 39-40).  Cabral testified that the Martin Luther King Day comment was made in January 2000 – more than 300 days before Cabral filed his EEOC Charge and more than two years before he filed the Complaint.  (Id. at 31).  The "if you don't like it" comment was supposedly made sometime between January and March 2000 and thus also likely more than 300 days before Cabral filed his EEOC Charge and definitely more than two years before Cabral filed the Complaint.  (Id. at 25)

Cabral further testified that, except with respect to the Martin Luther King Day comment, he never complained to management or his union about the jokes or comments.  (Id. at 31-34, 44, 57, 65)  He did not do so even though (a) the Company had an anti-discrimination policy and an open door policy, the latter with which Cabral acknowledged familiarity and (b) the Union/Company CBA contained both anti-discrimination and grievance and arbitration provisions with which Cabral was also familiar.  (Id. at 51, 56-57)  As a result, none of the supervisory or management personnel at the Moorestown facility were aware of Cabral's allegations of racist jokes until he filed his EEOC Charge.  (Exh. 5, Fonseca Tr. at 24-25)

With regard to the purported "go back where you came from" comment in particular, Cabral testified that it had nothing to do with his national origin.  Rather, it related to going back to his former job.[6]  (Exh. 2, Cabral Tr. at 24-28)  Cabral testified that just before the comment was made, he was speaking with a co-worker about his dissatisfaction with a change in

---

[5]    Although not alleged in his Complaint, Cabral testified at his deposition that, when his supervisor Joe Ortlieb was new to the department, Ortlieb asked Cabral why he was taking a Monday in January 2000 off.  Cabral replied that it was Martin Luther King Day.  Ortlieb then allegedly stated, "If you ask me, you guys are having too many holidays" and allegedly asked, "Who is Martin Luther King."  (Exh. 2, Cabral Tr. at 30-31)

[6]    Prior to working at Philadelphia Coca-Cola, Ortlieb and Cabral had worked together at another company called Atlantic Systems.  (Exh. 2, Cabral Tr. at 190-91)

the Company's health insurance benefits.  (Id. at 27)  Joe Ortlieb, Cabral's supervisor,

purportedly joined the conversation, telling Cabral, "if you don't like it, why don't you go back

where you came from."  (Id. at 28)  Ortlieb then added, "go back and make the $2,000 a week

you was [sic] making before."  (Id.)  Cabral admitted at his deposition that when Ortlieb said that

Cabral should go back to where he was "before," Ortlieb was referring to Cabral's "previous

employer."  (Id.)  Thus, even if made, there was no improper animus in the remark.

### 2. Denial of Favorable Route Assignments Claim

Cabral also claims in the Complaint that the Company discriminated against him

with respect to the daily assignments of the three established driver routes.  More specifically, he

alleges that he is not assigned his preferred route – the Marmora route – as often as he would like

and instead is required to drive more often to Philadelphia and Langhorne.  (Exh. 2, Cabral Tr. at

67-68)

Driver routes are assigned on a daily or hourly basis based on production needs

and as supervisors in the Moorestown transport area are notified of the need for a delivery or

pickup to a particular location.  (Exhibit 7, Transcript of the November 7, 2002 Deposition of

Joseph Ortlieb, hereinafter "Ortlieb Tr.", at 63-64)  Typically, when the need arises to make a

delivery to Marmora, the route is assigned to the next available driver, assuming that the driver

has non-overtime hours available and another more pressing need does not arrive in the interim.

(Id. at 64-68; Exhibit 8, Transcript of the November 19, 2002 Deposition of Richard Andrilli,

hereinafter "Andrilli Tr.", at 17-18)

At his deposition, Cabral admitted that he has driven all three routes during his

tenure with the Company.  (Exh. 2, Cabral Tr. at 63)  He further admitted that there is no

difference in compensation between the three routes; he just prefers to drive the Marmora route

over the other two because of the longer driving time.  (Id. at 64, 69)  Additionally, Cabral

acknowledged that no one is assigned to exclusively one route and that those who drive their first run of the day to Marmora often do their second run to Philadelphia and vice versa.  (Id. at 71-72)

### 3.    Retaliation Claim

Lastly, Cabral avers in his Complaint and repeated at his deposition that he was the victim of retaliation after he filed his EEOC Charge on December 13, 2000.  (Exh. 1, Complaint at ¶¶ 34-38).  The claim has its genesis in an April 2001 request by Cabral to Luis Fonseca ("Fonseca"), Philadelphia Coca-Cola's Director of Labor Relations, who is Hispanic, for one week of unpaid leave in May 2001 under the Family Medical Leave Act ("FMLA leave") in order to visit his sick sister-in-law.  (Id. at ¶ 35; Exh. 2, Cabral Tr. at 75-76).  Fonseca denied Cabral's request for leave under the FMLA because the leave did not relate to an immediate family member and thus was not FMLA qualifying.  However, Fonseca told Cabral to take the time off as personal days to the extent that he could.  (Id. at 82-84)  To the extent Cabral could not take the time as personal days, Fonseca said that he would "take care of it."  (Id. at 84)

With the Company's blessing, Cabral went to and remained in Florida during the entire week of May 20, 2001.  (Id. at 84-85, 113).  To account for his absence under the Union / Company CBA, the Company allocated May 21, 22, and 23 as personal days and May 24 and 25 as "occurrences" under its attendance policy – days in which an employee calls out for missing work without using a sick, personal or vacation day.[7]  (Id. at 89-90, 94, 99)  The Company could not allocate May 24 and 25 to personal days because another, more senior employee also sought those days and had preference because of his seniority.  It also could not allocate the days to

---

[7]    Although May 23 was initially counted as an occurrence, it was subsequently reclassified as a sick/personal day.  (Exh. 2, Cabral at 99, 104-07)

vacation because Cabral was out of vacation time at that point.[8]  (Id. at 75)  Classifying the two

days as occurrences did not result in Cabral experiencing a loss of pay, alteration of duties, or

other penalty.[9]  (Id. at 98-100)

        After returning from Florida, Cabral submitted a note from his dentist that stated

that Cabral had periodontal surgery in Philadelphia on May 23 and was out of work from May

23rd to May 25th as a result.  (Id. at 86-87; Exhibit 9, Note of Dr. Jose N. DeCardona).  Cabral

knew when he submitted the note that it was false, that he was in Florida at the time, and that he

did not have surgery on May 23rd.  According to Cabral, he submitted the falsified note to limit

the number of occurrences that he would get under the Company's attendance policy.[10]  (Exh. 2,

Cabral Tr. at 87-94, 111-12)

        After receiving the note, Fonseca spoke with Cabral about the apparent and

obvious inconsistency.  During the conversation, Cabral acknowledged to Fonseca that he had

had oral surgery three weeks prior to May 23rd and that Cabral had asked his dentist to

misrepresent the dates on the note.  (Exh. 5, Fonseca Tr. at 45)  Thereafter, based on Fonseca's

recommendation, Cabral was terminated for dishonesty.  (Id. at 43-44; Exh. 2, Cabral Tr. at 95)[11]

---

[8]    The Company could have counted the two remaining days as "sick personal days," which
would not have resulted in an occurrence – something Joe Ortlieb, Cabral's supervisor, offered to
do – but Cabral declined the offer.  (Exh. 7, Ortlieb Tr. at 89-90)

[9]    There is no penalty for receiving up to three occurrences.  (Exh. 3, CBA, Supplement No.
5, p. 43)  An employee who receives three occurrences within a seven-month period is given a
"Written Warning," which does not carry any loss of pay or other meaningful penalty.  (Id.; Exh.
2, Cabral Tr. at 99-100).

[10]    According to the Company's absence policy, multiple day absences for illness are treated
as only one occurrence if the employee produces a doctor's note.  (Exh. 2, Cabral Tr. at 93)

[11]    In addition to the dishonesty evident from the note itself, the Company viewed Cabral's
submission of the falsified note as an attempt by him to get paid for the Memorial Day holiday,
                                       (continued…)

Cabral subsequently complained to the Union about his termination, and the Union grieved it on his behalf. Ultimately, the matter was reviewed by the Joint Local Committee, which reduced Cabral's termination to a suspension and returned him to work without back pay for the approximately three months that he was out of work.[12] (Id. at 95) Cabral remains employed by Philadelphia Coca-Cola as a transport driver today.

III.    **ARGUMENT**

Rule 56 of the Federal Rules of Civil Procedure governs the granting of summary judgment and provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c). When the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Once the moving party demonstrates that no genuine issue exists and that, as a matter of law, it is entitled to judgment, the burden then shifts to the non-moving party to introduce evidence beyond the allegations in the complaint which creates a genuine issue of material fact. See Sunshine Books, Ltd. v. Temple Univ., 697 F.2d 90, 96 (3d Cir. 1982).

_____

(..continued)
which fell on the Monday after Cabral returned from Florida, when he was otherwise not entitled to such pay. (Exh. 7, Ortlieb Tr. at 31, 33)

[12]    Plaintiff did work during his three months away from Philadelphia Coca-Cola for other employers. (Exh. 1, Cabral Tr. at 95-96)

For a factual dispute to be "genuine," the evidence presented must be such that a reasonable jury could return a verdict for the non-moving party.

> [T]he judge must ask … whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff … 'upon whom the *onus* of proof is imposed.'

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (citation omitted).

The evidence must be admissible, not merely hearsay or conclusory allegations.

See, e.g., Williams v. West Chester, 891 F.2d 458, 470 (3d Cir. 1989).  To defeat a motion for summary judgment, the non-moving party:

> may not rest upon mere denials of the facts identified by the movant as supportive of its position, nor upon the vague and amorphous argument that the record somewhere contains facts sufficient to support its claims, Childers v. Joseph, 842 F.2d 689 (3d Cir. 1987), nor upon substituting 'conclusory allegations of the complaint . . . with conclusory allegations of an affidavit.'

Chu v. Samuel Geltman & Co., No. 92-4480, 1993 U.S. Dist. LEXIS 17473, at *6 (E.D. Pa. Nov. 17, 1993) (quoting Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990)).

A court must enter summary judgment "against a [non-moving] party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  See Celotex, 477 U.S. at 322; Equimark Commercial Finance Co. v. C.I.T. Financial Servs. Corp., 812 F.2d 141 (3d Cir. 1987).  In the context of employment discrimination claims, summary judgment appropriately is granted to the defendant where the plaintiff is unable to raise a genuine issue of material fact as to either:  (1) one or more elements of the plaintiff's prima facie case or (2), if the employer offers a legitimate reason for the challenged employment action, whether the employer's

proffered explanation is untrue and is in fact a pretext for unlawful discrimination.  Krouse v.

American Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997).  As set forth more fully below, based

upon the undisputed material facts established in the course of discovery, the Court should grant

summary judgment to Philadelphia Coca-Cola on all of Cabral's claims.[13]

A.    **Summary Judgment Should Be Granted As to Plaintiff's Hostile Work Environment Claim.**

Cabral's hostile work environment claim consists solely of (a) alleged offensive

"racist jokes" by co-workers and (b) the purported "go back where you came from" comment by

Cabral's supervisor, Joe Ortlieb, as well as Ortlieb's alleged reference to drivers being given

Martin Luther King's birthday as a holiday.  To establish a valid hostile work environment

claim, Cabral must demonstrate (1) that he suffered intentional discrimination because of his

national origin; (2) that the discrimination was pervasive and regular; (3) that the discrimination

detrimentally affected Cabral; (4) that the discrimination would detrimentally affect a reasonable

person of the same national origin in that position; and (5) the existence of respondeat superior

liability (either by showing that the harassing conduct was carried out by a supervisor or, in the

case of co-worker harassment, that the Company knew or should have known of the harassment

and failed to take corrective action).  Faragher v. City of Boca Raton, 524 U.S. 775 (1998);

Weston v. Commonwealth of Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001); Kovoor v. School

Dist. of Philadelphia, 211 F. Supp. 2d 614, 626 (E.D. Pa. 2002).  As set forth below, Cabral's

---

[13]    In addition to the claims addressed herein, Cabral attempts to raise a failure to hire claim in the "Allegations of the Named Plaintiff" section of the Complaint.  (Exh. 1, Complaint at ¶ 38)  This claim obviously fails as to Cabral for it is undisputed that the Company hired him. Further, Cabral acknowledged at his deposition that he was not discriminated against in his hiring and that he was hired into the position for which he applied.  (Exh. 2, Cabral Tr. at 11-12)

hostile work environment claim fails because, at a minimum, he has not and cannot produce

sufficient evident to withstand summary judgment based on the first, second and fifth prongs.

      1.      **Plaintiff's Hostile Work Environment Claim Fails Because He Did Not Suffer Discrimination "Because of His National Origin."**

Not all conduct of a hostile nature raises issues of discrimination under Title VII

or Section 1981. Rather, the conduct must be "because of" the plaintiff's protected status – here,

Cabral's national origin. 42 U.S.C. § 2000e-2(a)(1). Where the conduct at issue is motivated by

a factor other than the plaintiff's protected status, it is not actionable. See Brown v. Henderson,

257 F.3d 256 (2d Cir. 2001) (affirming summary judgment because "there is overwhelming

evidence that the hostility toward [plaintiff] was grounded in workplace dynamics unrelated to

her sex"); Lack v. Wal-Mart Stores, Inc., 240 F.3d 255 (4th Cir. 2001) (granting judgment as a

matter of law as to plaintiff's hostile work environment claim because "the evidence compels the

conclusion that [the harasser] was just an indiscriminately vulgar and offensive supervisor" and

that the harassment was not "because of" the plaintiff's gender); Gharzouzi v. Northwestern

Human Services of Pennsylvania, 225 F. Supp. 2d 514, 534 (E.D. Pa. 2002) ("Verbal …

harassment, no matter how unpleasant and ill-willed, is not prohibited by Title VII if not

motivated by the plaintiff's membership in some protected group.") (citations omitted); Weston

v. Commonwealth of Pennsylvania, Civ. Action No. 98-3899, 2001 U.S. Dist. LEXIS 19185, at

*34 (E.D.Pa. Nov. 20, 2001) (granting summary judgment as to hostile work environment claim

because "none of the evidence suggests that plaintiff was discriminated against" because he is a

man).

As the Fourth Circuit recognized in Lack in the analogous context of a sexually

hostile work environment claim:

      Oncale [v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998)]
      … clearly instruct[s] that it is not enough that the challenged

> conduct be sex-specific.  Since a hostile work environment claim is
> fundamentally a sex discrimination claim, a male plaintiff must
> establish that the harasser discriminated against him, i.e. treated
> him differently or with greater hostility, because he is a man.

240 F.3d at 261.  Here, although Cabral alleges in his Complaint that the purported jokes told by

his co-workers related to both African-Americans and Hispanics, at his deposition he could not

identify any that were aimed at him or other Hispanics as opposed to African-Americans.  (Exh.

2, Cabral Tr. at 40-44, 64-65)  See Ngeunjuntr v. Metropolitan Life Ins. Co., 146 F.3d 464, 467

(7th Cir. 1998) ("comment about Middle Easterners … hardly seems relevant to [the plaintiff],"

who was from Thailand).  Moreover, it is clear from the articulated context of the "jokes" that, to

the extent they were told to Cabral, they were not told for the purpose of discriminating against

or harassing Cabral, but rather were simply "indiscriminately vulgar and offensive" language.

See, e.g., Exh. 2, Cabral Tr. at 41-43, 215-16 (co-worker telling Cabral a "joke" about a

Caucasian who found out that his wife had been intimate with an African-American).  See

Baskerville v. Culligan Int'l, 50 F.3d 428, 430 (7th Cir. 1995) ("[Title VII] is not designed to

purge the workplace of vulgarity.").  Accordingly, the purported racist jokes told by co-workers

cannot form the basis of a hostile work environment claim.

      Similarly, the alleged remark by Joe Ortlieb concerning the Martin Luther King

holiday, while arguably inappropriate and insensitive, is incapable of being interpreted as a

remark made "because of" Cabral's national origin.  As to Ortlieb's purported "go back to where

you came from" comment, Cabral admitted at his deposition that the alleged comment referred

not to Cabral's national origin, but rather to Cabral's prior place of employment.  Cabral testified

as follows:

> A:    … I was telling [a coworker] how come [sic] they are doing
> this to us when they signed a contract saying that we was
> [sic] going to have Blue Cross and Blue Shield and we was

> [*sic*] not going have to pay anything out of our pockets.
> And that's when Mr. Ortlieb jump [*sic*] into the
> conversation. He says [*sic*] to me, if you don't like it, why
> don't you go back to where you came from.

* * *

> Q:    Did [Ortlieb] say anything further to you after you said that
>       to him?

> A:    Yes. He said go back and make the $2,000 a week like you
>       was [*sic*] making before….

* * *

> Q:    When he said go back to where you were before, what was
>       he referring to, your previous employer?

> A:    My previous employer.

(Id. at 27-28) Thus, this comment, even if made, cannot support a hostile work environment claim.[14]

### 2.    Plaintiff's Hostile Work Environment Claim Fails Because the Hostile Atmosphere Was Not Pervasive and Regular.

"The Supreme Court emphasized that there is another requirement which prevents

Title VII from expanding into a general civility code for the workplace: 'it forbids only behavior

---

[14]    Additionally, even if they were indicative of national origin animus, the purported comments by Ortlieb may not be considered because they were separate from the alleged co-worker "jokes" and Cabral testified that they were made more than 300 days prior to the date on which Cabral filed his EEOC Charge and more than two years before he filed the Complaint. Any claim based upon such remarks is therefore time-barred. See 42 U.S.C. § 2000e-5(e) (setting 300 day pre-Charge limitations period for Title VII claims); Kovoor v. School Dist. of Philadelphia, 211 F. Supp.2d 614 (E.D. Pa. 2002) (two year pre-Complaint limitations period for Section 1981 claims). Further, Cabral never complained about the alleged "go back where you came from" comment, despite the fact that the Company maintained a valid anti-harassment and discrimination policy with a complaint procedure. (Exh. 2, Cabral Tr. at 34) See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998) (employer has defense to hostile work environment claim stemming from supervisor conduct when employer exercised reasonable care to prevent and correct harassing behavior and plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities provided by the employer).

so objectively offensive as to alter the 'conditions' of the victim's employment.'"  Weston v.

Commonwealth of Pennsylvania, Civ. Action No. 98-3899, 2001 U.S. Dist. LEXIS 19185, at

*18 (E.D.Pa. Nov. 20, 2001) (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75,

81 (1998)).  See also Oncale, 523 U.S. at 78 ("When the workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment, Title VII is

violated.") (citation omitted).  In determining whether this high standard is met, a court will look

at a number of factors including, "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance."  Harris v. Forklift Systems, Inc.,

510 U.S. 17, 23 (1993).

        In this case, Cabral seeks to establish a hostile work environment based on the

following:

- Purported jokes unrelated to Hispanics or him;

- Ortlieb's alleged innocuous and time-barred comment that Cabral should go back to his former employer if he was not happy at Philadelphia Coca-Cola;

- Ortlieb's comment – allegedly made when Cabral advised Ortlieb, who was new to his position, that a certain Monday was Martin Luther King Day and a holiday – that "you guys are having too many holidays" and Ortlieb's supposed asking, "who is Martin Luther King;" and

- Two alleged co-worker comments that Hispanics should not be paid as much as Whites.

This is simply not enough to meet the "pervasive and regular" standard.  There is no evidence that the alleged comment and/or jokes were particularly severe, threatening, or intimidating or that they interfered in any way with Cabral's work or work performance.  In fact, other than the Martin Luther King comment, Cabral never felt the need to complain about the comments.  At most, the comments were "offensive utterances" of exactly the type that courts routinely recognize cannot form the basis of a hostile work environment claim.  See Ngeunjuntr, 146 F.3d at 467 (derogatory comments about plaintiff based on his East Asian descent do not establish hostile work environment, particularly where most were not directed at plaintiff); Harrison v. Metropolitan Government of Nashville and Davidson County, 80 F.3d 1107, 1118 (6th Cir. 1996) (no racially hostile work environment where employee subjected to racial incidents, despite testimony of stress and sleeplessness, could not show that they adversely impacted his work performance); West v. Philadelphia Electric Co., 45 F.3d 744, 753 (3d Cir. 1995) (noting that mere offensive utterance does not establish hostile work environment claim); Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994) (to establish a hostile work environment claim, "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments"); Gharzouzi, 225 F. Supp. 2d at 534-36 (six alleged incidents of harassment over several months insufficient as a matter of law to establish hostile work environment claim because "inappropriate, racial comments that are sporadic or part of casual conversation do not violate Title VII") (internal quotations omitted); Bishop v. National Railroad Passenger Corp., 66 F. Supp. 2d 650, 665 (E.D. Pa. 1999) ("several degrading and offensive remarks to plaintiff" by co-worker does not create a hostile work environment); Maher v. Assoc. Services for the Blind, 929 F. Supp. 809, 813 (E.D. Pa. 1996) ("Title VII does not protect a plaintiff who experiences conduct that is merely offensive or annoying").  See also Ebert v. Office of Information Systems,

Civil Action No. 97-530-SLR, 1999 U.S. Dist. LEXIS 12100, at *19 (D. Del. July 28, 1999)

(summary judgment granted where, "other than plaintiff's conclusory testimony, there is no

evidence suggesting that these jokes were a 'regular and pervasive' feature of work").

3.    **Plaintiff's Hostile Work Environment Claim Fails Because There is No Basis For Finding Respondeat Superior Liability.**

Even if a hostile work environment is found to exist, Cabral's claim would still

fail because he cannot establish a basis for holding Philadelphia Coca-Cola liable.  The jokes and

comments identified by Cabral were all made by co-workers.[15]  "[W]hen the source of the

alleged harassment is a co-worker, a plaintiff must demonstrate that the employer failed to

provide a reasonable avenue for complaint, or, if the employer was aware of the alleged

harassment, that it failed to take appropriate remedial action."  Weston, 251 F.3d at 427.  See

also 29 C.F.R. § 1604.11(d) (employer is liable for co-worker harassment if it knows or should

have known of the conduct, unless it can show it took immediate and appropriate corrective

action).  Cabral can make no such showing.

Cabral testified that he did not complain to anyone at Philadelphia Coca-Cola

about the alleged jokes and comment.  Nor did he file a grievance concerning the supposed

conduct and comments with the Union.  He did not do so even though the Company maintained

and posted a valid anti-harassment policy with complaint procedure, had an open door policy,

and was party to a collective bargaining agreement that contained both a prohibition on

discrimination and a grievance and arbitration procedure.  See, supra, at 6.  Further, there is no

evidence that Philadelphia Coca-Cola had independent knowledge of the purported jokes or

otherwise should have been aware of them.  Id.  Accordingly, Philadelphia Coca-Cola cannot be

---

[15]    As set forth above, the two comments allegedly made by Cabral's supervisor are not indicative of any bias against Cabral or Hispanics in general.

held liable for the conduct about which Cabral now complains.  See Sicalides v. Pathmark Stores, Inc., Civil Action No. 99-cv-3465, 2000 U.S. Dist. LEXIS 8051, at *24-26 (E.D. Pa. June 12, 2000) (summary judgment granted as to hostile work environment claim because plaintiff did not complain about harassment and because there was no evidence that the employer was or should have been aware of the harassment).

        **B.**        **Summary Judgment Should Be Granted as To Plaintiff's Claim That the Company Discriminates With Respect to Driver Route Assignments.**

Cabral also alleges discrimination with respect to the assignment of the Philadelphia, Langhorne and Marmora routes.  Although he admits that he drove the Marmora route at times, he contends that he should have been assigned the Marmora route more often. This claim fails both because the denial of a preferred route assignment is not a "tangible employment action" and because Plaintiff has produced no evidence to suggest that the reasons proffered by the Company as to why Cabral was not assigned the Marmora route more often are pretextual.

Claims of national origin discrimination brought under Title VII and Section 1981 follow the familiar burden shifting framework first articulated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, a plaintiff must make out a prima facie case of unlawful discrimination by showing (1) that he belongs to a protected class; (2) that he requested and was qualified for a job benefit; (3) that he suffered some adverse employment action; and (4) that similarly situated non-protected persons were treated more favorably.  Johnson v. Diamond State Port Corp., No. 01-4031, 2002 U.S. App. LEXIS 23389, *8 (3d Cir. Oct. 30, 2002); Tolani v. Upper Southampton Township, 158 F. Supp. 2d 593, 597 (E.D. Pa. 2001).

Once the plaintiff establishes a <u>prima facie</u> case, the burden of production (but not the ultimate burden of proof) shifts to the defendant to provide a legitimate, non-discriminatory reason for terminating the plaintiff.  After the employer makes such a proffer, the burden returns to the plaintiff to prove that the reason articulated by the employer is a mere pretext for discrimination.  <u>Sheridan v. E.I. Dupont de Nemours Co.</u>, 100 F.3d 1061, 1066-67 (3d Cir. 1996) (en banc), <u>cert. denied</u>, 521 U.S. 1129 (1997); <u>Geraci v. Moody-Tottrup, Intern.</u>, 82 F.3d 578, 580 (3d Cir. 1996).  Here, Cabral's claims fail because, at a minimum, he suffered no tangible adverse employment action and because Cabral has failed to produce any evidence that the Company's proffered explanation concerning how it assigns routes to drivers is pretextual.

1.    **Plaintiff Suffered No Tangible Adverse Employment Action.**

Summary judgment is appropriate because the purported unfair assignments of routes did not result in Cabral suffering a tangible adverse employment action.  The Supreme Court established the contours of a tangible employment action in <u>Burlington Industrial v. Ellerth</u>, 524 U.S. 742 (1998).  It explained that a tangible employment action "constitutes a <u>significant</u> change in employment status, such as hiring, firing, failing to promote, reassignment with <u>significantly</u> different responsibilities, or a decision causing a <u>significant</u> change in benefits."  <u>Id.</u> at 761 (emphasis added).  A "tangible employment action in most cases inflicts direct economic harm."  <u>Id.</u> at 762.  <u>See also</u> <u>Brown v. Brody</u>, 199 F.3d 446, 451 (D.C. Cir. 1999) ("[A] plaintiff who … is denied a lateral transfer – that is, one in which she suffers no diminution in pay or benefits – does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm.  <u>Mere idiosyncrasies of personal preference are not sufficient to state an injury.</u>") (emphasis added); <u>Crady v. Liberty National Bank & Trust</u>

Co., 993 F.2d 132, 136 (7th Cir. 1993) (to be actionable, "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities").

Here, Cabral's contention is solely that he was assigned the Philadelphia and Langhorne routes more often than the Marmora route and that he preferred the Marmora route over the other two. He does not allege that he suffered a loss of pay or benefits as a result of the routes he was assigned. Nor does he allege any variation in duties between the three routes and, indeed, his duties were always the same – to move product and raw materials by tractor trailer between two points. See, supra, at 7-8. Accordingly, there is no tangible employment action sufficient to establish a prima facie case of discrimination. See Kindred v. Northome/Indus. School District No. 363, 154 F.3d 801, 804 n.4 (8th Cir. 1998) (assignment to driving route that plaintiff does not like "does not meet the threshold for showing an adverse employment action for the purpose of establishing a prima facie case of gender discrimination"), cert. denied, 525 U.S. 1109 (1999). See also Herrnreiter v. Chicago Housing Authority, No. 01-3202, 2002 U.S. App. LEXIS 27120, at *6-7 (7th Cir. Dec. 30, 2002) ("cases of purely subjective preference for one position over another" where "[t]he two jobs were equivalent other than in idiosyncratic terms … do not justify trundling out the heavy artillery of federal antidiscrimination law; otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit") (internal quotation marks omitted); Watts v. Kroger Co., 170 F.3d 505, 510 (5th Cir. 1999) ("changing one's work schedule" and "expanding the duties of one's job" is not a tangible employment action); Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir. 1998) (transfer of plaintiff, a teacher, from one school where she was teaching fourth grade to another where she was teaching second grade was not an adverse

employment action because the salary and benefits remained the same and because plaintiff continued to teach at an elementary school level); Doe v. Dekalb County School District, 145 F.3d 1441, 1448 (11th Cir. 1998) (finding no case in any circuit, "in which a court explicitly relied on the subjective preferences of a plaintiff to hold that that plaintiff had suffered an adverse employment action").

> 2. **There is No Evidence that the Company's Legitimate, Non-Discriminatory Reason for Not Assigning Plaintiff the Marmora Route More Often is Pretextual.**

Even if Cabral's supposedly limited opportunities to drive the Marmora route constitutes a tangible employment action, summary judgment would still be appropriate because he cannot demonstrate that the Company's legitimate, non-discriminatory reason for assigning routes is a pretext for unlawful discrimination. As set forth above, the Company assigns routes based on Company production needs, the availability of drivers, and concerns about minimizing overtime. This is obviously a legitimate, non-discriminatory reason for the way routes are assigned among transport drivers.

In light of the Company's articulation of a valid reason, it is Cabral's burden to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). To meet it, Cabral must focus on the reason proffered by the Company and demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." Id. at 765 (internal citations and quotation marks omitted).

Cabral has produced no evidence in the face of this burden that would so much as suggest that the Company's justification is pretextual. Nor has he identified evidence that an invidious motive was more likely the cause of Philadelphia Coca-Cola's decision making with respect to route assignments. Accordingly, summary judgment on Cabral's preferential route assignment claim fails for this reason as well. See Harden v. Southwark Metal Manuf. Co., Civil Action No. 99-4666, 2002 U.S. Dist. LEXIS 18664, at *33 (E.D. Pa. Oct. 2, 2002) ("subjective beliefs are not enough to overcome summary judgment" on claim that minorities' job assignments are discriminatorily changed) (citation omitted); May v. Roadway Express, Inc., 221 F. Supp. 2d 623, 629 (D.Md. 2002) (summary judgment granted as "to Plaintiff's assertion that route assignments and overtime were distributed in a discriminatory or retaliatory manner [because] Plaintiff has not provided any evidence aside from his own subjective opinion").[16]

C.    **Summary Judgment Should be Granted as to Plaintiff's Retaliation Claim.**

Cabral asserts in his Complaint that the decisions (1) to grant him other-than-FMLA leave and (2) to terminate him after he submitted a falsified dentist's note amounted to unlawful retaliation. (Complaint ¶¶ 34-35; Exh. 2, Cabral Tr. at 109) In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in protected activity, (2) the employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a causal link between the protected activity and the termination. Weston, 251 F.3d at 430; Woodson v. Scott Paper Co., 109 F.3d 913, 920

---

[16]    Although not alleged in the Complaint or EEOC Charge – and therefore not properly before the Court – Plaintiff alleged at his deposition that the Company also discriminated against him with respect to the assignment of weekend overtime work. (Exh. 2, Cabral Tr. at 122-29). However, the assignment of weekend hours is purely a function of each employee's relative seniority and United States Department of Transportation regulations that restrict the hours a driver may work. (Exh. 7, Ortlieb Tr. at 26-30) Accordingly, there is no merit to this claim, if considered by the Court.

(3d Cir. 1997).  If the plaintiff can establish a prima facie case, the analysis proceeds under same

burden shifting framework set forth above.  See id. at 920 n.2.  In this case, Cabral cannot

withstand summary judgment on a retaliation claim because he cannot establish a prima facie

case or show Philadelphia Coca-Cola's proffered justification to be pretextual.

1.    **Plaintiff Cannot Establish a <u>Prima</u> <u>Facie</u> Case of Retaliation.**

Philadelphia Coca-Cola assumes, for purposes of this motion, that Cabral can

establish the first prong of a prima facie case with respect to his failure to grant FMLA leave

claim and the first and second prongs with respect to his retaliatory termination claim.  Cabral

cannot establish the second prong of a prima facie case with his FMLA leave claim because he

suffered no adverse action – he was granted and took non-FMLA leave without penalty.  (Exh. 2,

Cabral at 99-100, 113).  Additionally, Cabral stumbles and falls with the third prong of both

claims – establishing a causal connection to his EEOC Charge.

Cabral is unable to adduce any evidence of a causal link.  More than four months

elapsed between the filing of his EEOC Charge and the personnel actions about which he

complains, which is hardly "unusually suggestive" of a retaliatory motive.  See Krouse v.

American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997).  Further, at his deposition, Plaintiff

could not articulate any evidence to support his contention that the Company was motivated by

retaliatory animus in terminating him and handling his request for FMLA leave.  When asked the

first time why he thought his termination was retaliatory, Plaintiff simply replied that the

Company, upon learning that his dentist's note was a lie, spoke to him in a "denigrating" tone.

(Id. at 109)  When asked again, Cabral stated that he thought it was retaliation because he was

merely following advice given to him by his union representative.  (Id. at 111-12)  When asked

the third and final time, Cabral testified, "Because – I don't know.  Mr. Ortlieb didn't like me.

That's it."  (Id. at 114-16).  This complete lack of evidence to support a causal connection

provides a clear basis for the granting of summary judgment on Cabral's retaliation claim.  See

Quiroga v. Hasbro, Inc., 934 F.2d 497, 500-01 (3d Cir. 1991); Phillips v. Dalton, No. 94-CV-

4828, 1997 U.S. Dist. LEXIS 419, at *19 (E.D. Pa. Jan. 22, 1997) ("mere allegation of the causal

connection … insufficient to withstand summary judgment on the retaliation claim").  Cf.,

Sunshine Books, Ltd. v. Temple Univ., 697 F.2d 90, 96 (3d Cir. 1982) (non-moving party must

introduce evidence beyond the allegations in the complaint to create a genuine issue of material

fact); Rhett v. Carnegie Ctr. Assocs. (In re Carnegie Ctr. Assocs.), 129 F.3d 290, 297 (3d Cir.

1997) (summary judgment for employer affirmed where plaintiff offered nothing more than her

opinion that she was most qualified to be promoted).

> 2.    **Even If Plaintiff Could Establish a <u>Prima</u> <u>Facie</u> Case of Retaliation, His Claim Would Still Fail Because He Cannot Show that Philadelphia Coca-Cola's Proffered Justification Was Pretextual.**

As set forth above, Philadelphia Coca-Cola terminated Cabral because he went to

his dentist; asked the dentist to prepare a falsified note saying he was having periodontal surgery

in Philadelphia when, in fact, he was in Florida visiting relatives; and then knowingly submitted

the falsified note to the Company in an effort to reduce the number of occurrences in his file and

to qualify for a paid holiday to which he was not entitled.  Cabral, in response to this legitimate,

non-discriminatory reason, has produced no evidence from which any reasonable fact finder

could conclude the proffered justification was pretextual.

The courts of this Circuit routinely grant and affirm summary judgment for the

defendant in cases where the plaintiff fails to put forward sufficient evidence of pretext with

respect to the employer's reasons for termination.  See, e.g., Fuentes, 32 F.3d at 766-67

(plaintiff's "[n]ot so" retorts to defendant's reasons for termination insufficient to prove pretext);

<u>Zappan v. Pennsylvania Board of Probation and Parole</u>, Civil Action No. 00-1409, 2002 U.S.

Dist. LEXIS 23424, *30-31 (E.D. Pa. Nov. 25, 2002) ("excuses for the plaintiff's conduct … do

not give rise to an inference that the defendants' actions were more than likely discriminatory");

<u>Page v. ECC Management Services</u>, Civil Action No. 97-2654, 1998 U.S. Dist. LEXIS 10857, at

*14-15 (E.D. Pa. July 20, 1998) (summary judgment granted on retaliation claim where

"[p]laintiffs present no facts to support [their] allegation, [but] merely repeat their allegations").

The same result is appropriate here.[17]

---

[17]     Plaintiff's Complaint is confusing insofar as it alleges only discrimination in the opening
paragraphs and the two counts, while seemingly asserting a claim of retaliation with respect to
Cabral's request for FMLA leave and his termination.  Although Philadelphia Coca-Cola has
assumed for purposes of this motion that these are retaliation claims, summary judgment would
be no less warranted in the event the Court or Plaintiff construes the claims as ones of
discrimination.  There is no evidence of any connection between Cabral's national origin and the
termination decision.  Indeed, the fact that Luis Fonseca, who is also Hispanic, conducted the
investigation and made the ultimate recommendation to terminate, strongly indicates that
Cabral's national origin was not a factor.

IV.    **CONCLUSION**

For all of the reasons set forth above, Defendant Philadelphia Coca-Cola Bottling Company respectfully requests that the Court grant its Motion for Summary Judgment, enter judgment in its favor as to both counts of the Complaint, and award its costs and attorneys' fees in defending this action.

Respectfully submitted,

Dated:  January ___, 2003

_____
Gerald S. Hartman
Gregory W. Homer, ID No. 58710
David J. Woolf, ID No. 76484
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA  19103-6996
(215) 988-2700

Attorneys for Defendant
Philadelphia Coca-Cola Bottling Company