IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSE CABRAL                    :    CIVIL ACTION
                               :
          v.                   :
                               :
                               :    02-2806
THE PHILADELPHIA COCA          :
COLA BOTTLING CO.              :


MEMORANDUM

**Padova, J.**                                    **March 18, 2003**

Plaintiff Jose Cabral has brought claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), and 42 U.S.C. § 1981, alleging discrimination based upon national origin and race (he is Hispanic), as well as retaliation for filing a complaint with the Equal Employment Opportunity Commission ("EEOC"). Defendant The Philadelphia Coca Cola Bottling Co. has filed a Motion for Summary Judgement to dismiss the Complaint in its entirety. For the reasons that follow, Defendant's Motion is granted in part and denied in part.


**I. Background**


Plaintiff has been employed by Defendant as a transport driver at Defendant's Moorestown plant since August 1996. He is still employed by Defendant at this time. Plaintiff claims that, on

numerous occasions, he overheard his supervisor, as well as other co-workers, make racist jokes about African Americans and Hispanics. Plaintiff claims that when he complained about Defendant's handling of his health care benefits, he was told to "...go back where you came from." (Pl's Mem. Ex. 1 at 28.) Plaintiff also claims that he referred six qualified Hispanics to the Defendant for employment positions, and that all six were denied employment. Plaintiff also asserts that he and other Hispanic drivers were denied weekend overtime shifts, which were paid at a premium hourly rate, and that he was denied the opportunity to drive specific routes which he felt were more desirable. In response to these incidents, Plaintiff filed an EEOC Charge on December 7, 2000.

Plaintiff further claims that, in May, 2001, his request to take a week off to attend to a family emergency in Florida was denied allegedly because of a company policy that two coworkers could not be absent on the same day, despite the fact that numerous exceptions to this policy had been granted for white coworkers. Plaintiff nevertheless took the time off, and presented a doctor's note which indicated that he had received oral surgery during his absence. Plaintiff admits that he received no such surgery. In response, Defendant suspended Plaintiff without pay, pending termination, June 22, 2001. Plaintiff was later reinstated on September 13, 2001, after filing a grievance with his Union, but

did not receive back pay for the period of his suspension. Plaintiff asserts that Defendant's failure to grant him the leave he requested, and decision to suspend him from work, were both acts of retaliation in response to his filing of the EEOC charge. Plaintiff filed the Complaint in the instant action on May 10, 2002.

## II. Legal Standard

Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) ("Rule 56"). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at

trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255. "If the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. Discussion

### A. Denial of Preferred Driving Route

Plaintiff first claims that he was not assigned to the

4

Marmora, New Jersey, driving route as often as other, white drivers. Drivers at Defendant's plant could be assigned to either the Philadelphia, Langhorne or Marmora driving routes. (Pl's Mem. Ex. 1 at 68, 73). Assignments were made by Joe Ortlieb, the warehouse manager at Defendant's plant and one of Plaintiff's supervisors, as well as other dispatchers. (Pl's Mem. Ex. 4 at 64). These assignments were made on an as-needed basis throughout the day. Id. Plaintiff asserts that Mr. Ortlieb repeatedly assigned the Marmora route to another, non-Hispanic driver, Rick Kajowski, while assigning the Philadelphia route to him. (Pl's Mem. Ex. 1 at 68).

Claims of disparate treatment under Title VII and 42 U.S.C. § 1981 are analyzed under the test developed in McDonnell Douglass Corp. v. Green, 411 U.S. 792 (1973).

> Briefly summarized, the McDonnell Douglas analysis proceeds in three stages. First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Jones v. School Dist. Of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglass, 411 U.S. at 802). In order to make out a prima facie case of discrimination under McDonnell Douglass, Plaintiff must show that he is a member of a protected class, that he was qualified for the position he held, that he

suffered an adverse employment action, and that this adverse employment action occurred under circumstances giving rise to an inference of discrimination.  <u>See e.g.</u>  <u>Robertson v. Ashcroft</u>, Civ. A. No. 00-5728, 2002 WL 109624, at *4 (E.D. Pa. January 28, 2002).

Defendant argues that Plaintiff has not established a prima facie case, because Plaintiff has not produced any evidence that the failure of Defendant to assign him to the Marmora Route was an adverse employment action.  Defendant argues that there is no objective difference between the Marmora Route and the other routes, and therefore that Plaintiff has not suffered a tangible employment action.  In <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742, 761 (1998), the Supreme Court held that a tangible employment action must involve a significant change in responsibilities, pay or benefits.  Specifically, courts have held that:

> A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

<u>Crady v. Liberty Nat. Bank and Trust Co.</u>, 993 F.2d 132, 136 (7th Cir. 1999); <u>see also</u> <u>Mitura v. Daulton</u>, Civ. A. No. 98-2006, 1999 WL 163629, at *3 (E.D. Pa. March 18, 1999).

It is not disputed that the Marmora Route does not pay a higher hourly rate.  Furthermore, there is no evidence that assignment to the Marmora Route carried with it any significant

change in responsibilities or benefits.    Plaintiff similarly
presents no evidence that the failure to assign him to the Marmora
Route hurt his chances for promotions within the company.
Plaintiff asserts that he preferred the Marmora route to the
Philadelphia route, because the driving distance to Marmora was
much greater than the distance to Philadelphia.    Thus, because the
trip to Marmora took longer, there would be less hooking and
unhooking of trailers when he reached the destination, and he would
have the opportunity to see the countryside. (Pl's Mem. Ex. 1 at
70-71). Plaintiff's preference to see the New Jersey countryside
and drive fewer, longer routes throughout his shift does not
transform Defendant's route assignments into tangible employment
actions. See Grande v. State Farm Mut Auto Ins. Co., 83 F. Supp. 2d
559, 563-64 (E.D. Pa. 2000)(finding that longer commute and
Plaintiff's impression that she had been treated poorly were not
sufficient to establish the presence of an adverse employment
action).[1]

---

[1] Plaintiff argues for the first time in his Reply Brief
that, because the Marmora Route is a greater distance, the
potential for earning overtime on the Marmora Route is greater
than with other routes.    There is testimony that while Defendant
tried to avoid assigning overtime during the week, it was
sometimes necessary to do so.    However, Plaintiff has pointed to
nothing in the record to indicate a causal link between
assignment to the Marmora Route and increased payment of
overtime. Plaintiff clearly testified that the total time for a
trip to and from Mamora was 5 hours, and thus an assignment to
the Mamora route would not in itself necessitate overtime pay.
(Pl's Mem. Ex. 1 at 70-71.) Indeed, Plaintiff in his deposition
did not cite the increased potential to earn overtime as one of

Thus, Plaintiff has not alleged sufficient facts to allow a finding that he suffered a tangible employment action when Defendant failed to assign him to the Marmora route more frequently.  Accordingly, Defendant's Motion for Summary Judgment is granted with respect to Plaintiff's disparate treatment claim based upon the denial of the Marmora route.


    B.  Discrimination in assignment of overtime shifts

Plaintiff asserts for the first time in his Reply Brief that he was discriminated against in the assignment of overtime shifts.  Specifically, Plaintiff alleges that Joe Ortlieb routinely denied him and the only other Hispanic driver, Esteban Roche, the opportunity to work weekend shifts, while giving other, non Hispanic drivers such shifts.  Weekend shifts are considered overtime, and are paid at a premium rate.

As a preliminary matter, Defendant argues that Plaintiff failed to make this specific claim in his EEOC charge and in his Complaint in the instant case.  Defendant therefore argues that these specific claims are barred, because Plaintiff failed to exhaust his administrative remedies.  Courts in this Circuit have held that, where a plaintiff asserts entirely separate and distinct

---

the reasons why he preferred the Marmora Route.  As Plaintiff has pointed to nothing in the record to support it, this claim must fail.

causes of action in his complaint which were not asserted in his EEOC charge, the court cannot consider them. See King v. M.R. Brown, Inc., 911 F. Supp. 161, 166 (E.D. Pa. 1995) (dismissing claim of quid pro quo sexual harassment where the plaintiff had only alleged a hostile work environment claim in his EEOC charge and complaint). However, where a plaintiff asserts new facts which merely buttress or explain his original causes of action, a court may properly consider them. See Anjelino v. New York Times Co., 200 F.3d 73, 94 (3d Cir. 1999) (allowing district court to consider new charges where "the additional charges... 'may fairly be considered explanations of the original charge and growing out of it.'") (quoting Ostapowicz v. Johnson Breeze Co., 541 F.2d 394, 399 (3d Cir. 1976)); see also Lang v. Genesis Health Ventures, Civ. A. No. 99-3478, 2000 WL 420633, at *2-3 (E.D. Pa. April 10, 2000). The key factors used in determining whether new allegations should be considered are whether the allegations included in the EEOC charge would reasonably have triggered an investigation by the EEOC into the newly alleged conduct, and whether the allegations in the EEOC charge would be sufficient to place the defendant on notice of the newly alleged conduct. Rufo v. Metropolitan Life Ins. Co., Civ. A. No. 97-6376, 1997 WL 164267, at *3 (E.D. Pa. April 7, 1997).

In the instant case, Plaintiff's new allegations involve the same actor, Joe Ortlieb. Moreover, while the EEOC Charge does not

contain the specific allegation that Mr. Ortlieb discriminated against Plaintiff in the assignment of overtime, the Charge does contain an allegation that Defendant engaged in disparate treatment, based upon race and national origin, with respect to the work assignments that Plaintiff was given.[2] (Pl's Mem. Ex. 14). Moreover, the EEOC Charge alleges that the discrimination Plaintiff faced included, *inter alia*, discrimination in "pay, compensation and/or overtime." Id.  Thus, Plaintiff's allegations in his EEOC Charge provided the EEOC with sufficient notice to reasonably have triggered an investigation into Mr. Ortlieb's shift assignments and their affect on Plaintiff's compensation and overtime pay.[3]  These claims may therefore be considered by this Court.

Plaintiff appears to allege that Defendant deliberately manipulated the starting and ending dates of his regular shifts, as well as Mr. Roche's shifts, in order to prevent them from being eligible for overtime shifts, which were paid at a premium rate.

---

[2] Plaintiff's "Statement of Personal Harm," attached to his EEOC charge, states that "I have been denied the opportunity to work on more favorable assignments.  For example, I have rarely been assigned to the more desirable assignment of transporting loads for the Moorestown plant to the Marmora site.  White employees are regularly given this assignment." (Pl's Mem. Ex. 14).

[3] Plaintiff's Complaint likewise provided sufficient notice to Defendant of Plaintiff's claims regarding the assignment of overtime. In the Complaint, Plaintiff alleges that he and other Hispanic workers were "often singled out or treated disparately when it comes to the number of hours they are permitted work on a given shift."  (Compl. ¶ 11).

Under Federal law, a driver must have eight hours of rest between shifts. (See Pl's Mem. Ex. 4 at 82-83).  Thus, an employee who ends a shift at 12 Midnight cannot work again until 8:00 AM. Additionally, under Federal law an employee may only work a certain number of hours per week. See id.  Plaintiff alleges that Mr. Ortlieb would force Plaintiff and Mr. Roche to work extended shifts on days they were scheduled to work, and which would not provide them with sufficient time off to allow them to volunteer for weekend overtime shifts.  Plaintiff asserts that he and Mr. Roche were forced to work these extended shifts even when there was no need for their services at the plant.  Plaintiff asserts that only he and Mr. Roche, the only Hispanic employees, were forced to work these extended shifts. (Pl's Mem. Ex. 1 at 122-23).

As one example, Plaintiff alleges that he was assigned to work a 10-hour shift on a Friday, ending at 12 midnight, which would have allowed him to work only 14 hours over the weekend.  (Pl's Mem. Ex. 13).  Plaintiff therefore was unable to sign up to work on both Saturday and Sunday of that week (apparently, a driver must work a full, 8-hour shift per day).  Thus, Plaintiff was assigned to work only the Sunday shift.  According to Plaintiff, there was not sufficient work for him to perform on this Friday night, and he was sent home at 10PM after 8 hours of work. Id.  Because he only worked 8 hours, Plaintiff would have had 16 hours of time left for the week, and would have been able to work both Saturday and

11

Sunday.  However, by the time he was sent home on Friday night, it was too late for him to sign up for the additional day. Id.; (see also Pl's Exh. 4 at 82-86).   Plaintiff believes that he was deliberately given the 10-hour shift so that he could not work overtime on Saturday. Id.  When Plaintiff filed a grievance with his Union with respect to this matter, he was paid for the Saturday shift that he did not work. Id.

Defendant asserts that, when the need arises, all drivers are subject to mandatory extended shifts. (Pl's Mem. Ex. 4 at 82-86). Defendant further asserts that when shift schedules are made it is impossible to predict whether there will be sufficient work for a driver to perform.  Thus, drivers may be sent home early from their shifts.  Moreover, Defendant asserts that weekend overtime shift schedules must be made in advance, and an employee who is unable to take a weekend shift because he is scheduled to work late Friday night cannot elect to work this shift at the last minute if his situation changes. Id. Thus, according to Defendant, all drivers run the risk of being denied overtime under this scenario.

Because  Defendant  has  asserted  a  legitimate,  non-discriminatory reason for its actions, Plaintiff must come forward with some evidence that this explanation is pretextual.  Without such evidence, the Court cannot interfere with a legitimate business decision of an employer. See Billet v. CIGNA Corp., 940 F.2d 812, 828 (3d Cir. 1991). In order to establish that an

employer's proffered reason was pretextual, a plaintiff must typically point to "inconsistencies or anomalies" in the employer's stated reasons which support an inference that the employer did not act for these reasons. Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995). The United States Court of Appeals for the Third Circuit ("Third Circuit") has noted that factors such as the defendant's credibility, the timing of the adverse action, and the defendant's treatment of the employee may all raise an inference of pretext. Josey v. John R. Hollingsworh Corp., 996 F.2d 632, 638-39 (3d Cir. 1993).

Plaintiff asserts that only he and Jose Nieves, the other Hispanic driver, were subjected to this treatment. (Pl's Ex. 1 at 122-23). If this were true, it would support Plaintiff's assertion that Defendant's stated reason for scheduling Plaintiff to extended shifts was pretextual, because it would be entirely inconsistent with Defendant's proffered explanation that all employees were subject to the denial of overtime because of shift scheduling. Plaintiff has submitted no evidence in support of this assertion, such as employee time records.[4]  However, because the Court must

---

[4] Indeed, Plaintiff's own deposition appears to contradict his assertion that only he and Mr. Roche were denied overtime. Specifically, Plaintiff states that the denial of overtime hours "has been very, very big problem that lot of people have complained about. And that's the way they do. They discriminate." (Pl's Mem. Ex. 1 at 122). If only Plaintiff and Mr. Roche were subjected to this treatment, it is not clear why others in the company would have complained about this issue.

accept all of Plaintiff's statements as true, and because Plaintiff would likely have had personal knowledge of at least some of his co-workers' experiences with overtime assignment, the Court holds that Plaintiff has alleged sufficient facts to survive summary judgment on this issue.

C. Retaliation Claim - Denial of Vacation Time and Termination

Plaintiff also argues that he was retaliated against for filing his EEOC Charge when he was denied personal leave to attend to a family emergency in Florida and was thereafter suspended for filing a false dentist's note to account for his absence. Plaintiff asserts that he requested five vacation days during the week of May 21,2001, but was denied leave for three of these days (May 23rd, 24th and 25th) for the stated reason that another, more senior, employee had already requested these days.[5]   Defendant responds that it was company policy not to permit two employees in the same position to take the same vacation days.   However,

---

[5] Plaintiff asserts that he also requested to use time under the Family & Medical Leave Act (FMLA).  According to Defendant, it disallowed this request because Plaintiff sought time off to visit his sister-in-law, who was ill, and one cannot use FMLA leave for this purpose.  To the extent that Plaintiff claims that this refusal was discriminatory, this claim must fail, because the FMLA does not allow leave to be taken for the purpose of attending to a serious health condition of a sister-in-law, and Plaintiff has presented no evidence that Defendant made exceptions to the FMLA requirements for any other employees. See 29 U.S.C. 2612(a)(1)(C).

Plaintiff asserts that two different Caucasian drivers, Kevin Flaherty and Mike Schafte, were allowed to take vacation days on the same day. (Pl's Mem. Ex. 1 at 79). Defendant asserts that the Moorestown plant was shut down on the date that both Flaherty and Schafte took vacation days. However, Plaintiff, who ostensibly would have personal knowledge of this fact, disputes this. Id.

Plaintiff, after being denied vacation time, made an agreement with Luis Fonseca and Mr. Ortlieb that he would still take the time off, and would use a combination of sick/personal days and "occurrences" to account for the three days he was denied vacation time.[6] Although the sequence of events is far from clear, it appears that Plaintiff did not want to use his sick/personal days for the three day absence. Rather, he wished to use "occurrences" for this task. Because three such "occurrences" taken within a six-month period would result in a written warning, Plaintiff apparently wished to minimize the number of "occurrences" he would be charged with for the three-day absence. Plaintiff admits that he therefore submitted a note from his dentist, stating that he had undergone oral surgery on Wednesday, May 23rd, and had been recuperating on Thursday and Friday, May 24th and 25th, when he in fact had been in Florida and had not had oral surgery on these

---

[6] Sick/personal days are to be used for illnesses and emergencies and do not require advance notice to the company. "Occurrences" are unexcused absences where an employee uses neither sick/personal nor vacation days.

dates.[7] (Pl's Mem. Ex. 1 at 117-18).

Because both Mr. Ortlieb and Luis Fonseca, the labor relations manager at the plant, already knew that Plaintiff had taken the time off to visit a sick relative, they questioned Plaintiff about the doctor's note. Upon questioning, Plaintiff admitted to submitting the false note, which his dentist had written at his request. On June 22, 2001, Plaintiff was suspended without pay pending termination due to dishonesty. After filing a grievance regarding his termination with the Union, Plaintiff was reinstated on September 13, 2001, but without back pay.

Plaintiff's presents two separate bases for his retaliation claim based upon this sequence of events. He first asserts that the failure to grant him vacation time for the full week constituted retaliation for his EEOC claim filing. In order to establish a prima facie case of retaliation, Plaintiff must demonstrate that he engaged in a protected activity, that the employer took an adverse action against him either contemporaneous with or after the protected activity, and that a causal link exists between the protected activity and the adverse employment action. See Farrell v. Planters Lifesavers Co., 206 F.3d 271 (3d Cir. 2000). Defendant argues that the denial of leave was not an

_____

[7] Apparently, multiple day unexcused absences for illness are counted as only one occurrence if the employee submits a doctor's note. (Pl's Mem. Ex. 1 at 33.)

adverse employment action, because the act itself did not lead to adverse consequences for Plaintiff.  The Court agrees.  It is not disputed that Plaintiff ultimately took the days off from work, apparently with Defendant's blessing, despite the denial of vacation leave.  More importantly, the denial of vacation leave on the specific dates that Plaintiff requested it, pursuant to Defendant's leave policy, is not a significant change in employee status and benefits, and does not represent an adverse employment action.  See King v. City of Philadelphia, No. Civ. A. 99-6303, 2002 WL 1277329, at *15 (E. D. Pa. June 4, 2002) (denial of sick leave and vacation time did not adversely affect the status of the employee and therefore did not qualify as retaliation, despite Plaintiff's allegation that Defendant imposed its leave policies more strictly upon him than upon other employees for filing complaints).

Plaintiff also asserts that Defendant's act of suspending him, pending termination, for dishonesty in response to his  submission of a falsified dentist note was a retaliatory act.  Plaintiff admits to submitting the note, which he knew was false.  However, although his submissions are not clear on this point, Plaintiff appears to state in his deposition that Mr. Fonseca told Carl Carlson, Plaintiff's shop steward, to tell Plaintiff to bring in a doctor's note in order to avoid incurring unexcused absences for

17

his trip. (Pl's Mem. Ex. 1 at 110-13).[8]  Plaintiff claims that he
only brought in the note after Mr. Carlson told him to do so. Id.
Plaintiff claims that Mr. Fonseca, knowing that Plaintiff was going
to be attending to a sick relative, gave Plaintiff permission to
bring in a doctor's note which Mr. Fonseca knew would be falsified,
and then used this doctor's note as pretext in order to fire
Plaintiff. Id.

Defendant argues that the necessary causal link between the
suspension of Plaintiff and the filing of the EEOC charge does not
exist.  The Third Circuit has held that a combination of factors
must be considered when determining whether the necessary causal
link has been established, including the timing of the employer's
act and other circumstantial evidence of discriminatory intent.
Farrell, 206 F.3d at 280.  Importantly, such evidence "is not
limited to timing and demonstrative proof, such as actual
antagonistic conduct or animus." Id. at 281.  All inferences drawn

---

[8] Plaintiff specifically testified that "Mr. Fonseca told
Mr. Carlson if it doesn't work, bring a doctor's note.  You're
only going to have one occurrence." (Pl's Mem. Ex. 1 at 112).
Later, Plaintiff testified that Mr. Carlson specifically told
him, "Bring a doctor's note." Id. at 113.  Defendant points out
that Plaintiff also states that "He [Mr. Carlson] didn't say
falsify the note." Id. at 112.  According to Defendant, this
admission establishes that Defendant never suggested to Plaintiff
that he bring in a falsified doctor's note, and thus that the
fabrication was entirely Plaintiff's idea.  However, Plaintiff
also alleges that Mr. Fonseca was well aware that Plaintiff
requested the time off to visit a sick relative, and not to
attend to health problems of his own.  Thus, Mr. Fonseca would
have known when he told Plaintiff to bring in a doctor's note
that such a note would necessarily be falsified.

from the actions of the employer must be resolved in favor of Plaintiff.  Id. at 284-85.  In Farrell, the Third Circuit utilized inconsistencies in the defendant employer's proffered reasons for terminating the plaintiff in determining that Plaintiff had established a prima facie case of retaliation.  Id. at 285.

In this case, a period of four months passed between the date of Plaintiff's EEOC charge and Defendant's suspension of Plaintiff.  Such a long period of time would likely not be enough, on its own, for Plaintiff to establish a prima facie case of discrimination.  See Silvestre v. Sera Care, Inc., No. 02-446, 2002 U.S. Dist. LEXIS 25267, at *24-29 (E.D. Pa. Dec. 30, 2002) (two month gap between adverse action and protected activity not sufficient in itself to establish prima facie case of retaliation.)  Furthermore, Plaintiff has presented little evidence of ongoing animosity between himself and his supervisors, besides his general comment that Mr. Ortlieb "didn't like me.  That's it."  (Pl's Mem. Ex. 1 at 116).  However, Plaintiff has also alleged that there are significant inconsistencies in Defendant's rationale for suspending Plaintiff.  Specifically, Plaintiff asserts that he was told by Defendant to produce the false note that was ultimately used as justification to suspend him.  Considering these inconsistencies in combination with the timing of the incident, a reasonable juror could determine that Plaintiff had established a causal link between the filing of the EEOC charge and the suspension.  Furthermore, because Plaintiff has

19

asserted that Defendant told Plaintiff to commit the very act that ultimately led to his termination, he has rebutted Defendant's claim that its suspension of Plaintiff for dishonesty was a valid management decision.[9]   Defendant's Motion for Summary Judgement with respect to Plaintiff's retaliation claim is therefore denied.

D. Hostile Work Environment

Plaintiff asserts a claim of hostile work environment based upon numerous incidents.  Hostile work environment causes of action "afford[ ] employees the right to work in an environment free from discriminatory intimidation, ridicule and insult," even where such conduct does not have a direct economic impact upon the employee. Meritor Savings Bank v. Vinson, 477 U.S. 57, 65-66 (1986).   To establish a hostile work environment claim, Plaintiff must show that he was subjected to intentional discrimination because of his national origin; that the discrimination was pervasive and regular; that the discrimination would detrimentally affect a reasonable person of the same national origin in that position; and the presence of respondeat superior liability. Kunin v. Sears Roebuk & Co., 175 F.3d 289, 293 (3d Cir. 1999).  Where the alleged hostile work environment is based upon acts undertaken by co-workers, respondeat superior liability can only be shown where the defendant

_____

[9] The Third Circuit in Farell recognized that, in reaching their holdings in retaliation cases, courts will often utilize the same evidence used in establishing a prima facie case to establish pretext.  Farrell, 206 F.3d at 286.

knew or should have known about the harassment and failed to take remedial action. Id. at 293-94.

Defendant argues that Plaintiff's submissions are insufficient to allow a finding that the discrimination was sufficiently pervasive to detrimentally affect a reasonable person in Plaintiff's position. In support of his claim, Plaintiff contends that he was subjected to racist comments by his Joe Ortlieb, his supervisor. Plaintiff contends that Mr. Ortlieb told him and another co-worker to "go back where you came from." (Pl's Mem. Ex. 1 at 27-28.) Specifically, Plaintiff testified that Ortlieb said "go back and make the $2,000 a week like you was making before." Id.[10]

Plaintiff also alleges that Mr. Ortlieb made an insensitive comment about the Martin Luther King Holiday, proclaiming that the workers already had too many holidays and asking who Martin Luther King was. Id. at 30-31. Plaintiff reported Mr. Ortlieb's comment regarding Martin Luther King Day to the vice president of human resources. Id. at 33.[11]

---

[10] When read in context it appears that Ortlieb was referring to Plaintiff's previous employer, and not his country of origin. Plaintiff admitted during his deposition that this was a possibility. (Pl's Mem. Ex. 1 at 30).

[11] Defendant argues that both of these comments cannot be considered in support of Plaintiff's hostile work environment claim, because these comments were both made more than 300 days before Plaintiff filed his EEOC charge and are therefore time barred. First, Plaintiff testified that the "Go back where you

These two isolated comments are not sufficient in themselves to establish a hostile work environment claim. The Supreme Court has clearly held that isolated incidents of harassment, unless extremely serious, do not alter the conditions of one's employment and therefore do not create a hostile working environment. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Ortlieb's two comments to Plaintiff cannot be considered extremely serious, and therefore cannot, on their own, establish a hostile work environment. See e.g. Bishop v. National R.R. Passenger Corp., 66 F. Supp. 2d 650, 665 (E.D. Pa. 1999)("several" offensive remarks over three year period not sufficient to sustain hostile work environment claim, where conduct did not involve physical threats or intimidation).[12]

---

came from" comment was made as late as March, 2000, which would make the comment timely. In any event, the Supreme Court in National Railroad Passenger Corp. v. Morgan, 122 S. Ct. 2061, 2077 (2002) held that a court may consider acts occurring outside the 300 day filing period in support of a hostile work environment claim, if the acts are part of the same unlawful employment practice and at least one act falls within the time period. Here, Plaintiff alleges a pattern of harassment committed by the same supervisor, Joe Ortlieb, including racially insensitive comments and undesirable work assignments. Thus, the Court may consider Mr. Ortlieb's comments in connection with the hostile work environment claim.

[12] Plaintiff also asserts that numerous co-workers made racially insensitive comments, including telling Plaintiff and other minorities that they should earn less than white workers. Plaintiff, however, never complained about any of these co-worker statements to Defendant, and there is no evidence that Defendant failed to provide avenues for such complaints to be made. (Pl's Mem. Ex. 1, at 45.) Plaintiff has also failed to present any evidence that these comments were made so regularly that

Plaintiff attempts to bolster his claims with allegations of other conduct which he claims contributed to the hostile work environment that he experienced.  Plaintiff alleges that the failure of Defendant to hire other Hispanic drivers, some of whom Plaintiff referred to the company, and Defendant's firing of another Hispanic employee, Jose Nieves, contributed to *his* hostile working environment.

Plaintiff provides no explanation for how Defendant's failure to hire other minority employees, and its decision to terminate Jose Nieves, created a working environment that was hostile to him, or otherwise altered the terms and conditions of his employment. Courts have held that hostile treatment of other employees can be relevant in establishing a hostile work environment claim, if there

---

Defendant's management must have had independent knowledge of them. See Sicialedes v. Pathmark Stores, Inc., No. 99-CV-3465, 2000 U.S. Dist. Lexis 8051, at *25 (E.D. Pa. June 12, 2000). Plaintiff asserts that he did not complain about these remarks because he believed that his complaints would be futile.  He bases this belief on the failure of Defendant's human resources department to follow up with him after he complained to them about Mr. Ortlieb's comment concerning Martin Luther King Day. (Pl's Mem. Ex. 1. at 33-34 & 217-18).  Plaintiff's own deposition appears to contradict this assertion.  Specifically, when Plaintiff was asked if he ever complained about jokes made by co-worker Walter Lesinki, Plaintiff responded, "No, they were jokes." Id. at 45.  Moreover, Defendant's failure to respond favorably to Plaintiff's solitary complaint concerning Ortlieb's Martin Luther King Day comment does not establish that Defendant failed to provide Plaintiff with a "reasonable avenue for complaint."  Weston v. Pennsylvania, 251 F.3d 420, 427 (3d Cir. 2001).  Thus, Plaintiff cannot establish respondeat superior liability of Defendant with respect to these comments, and they are not relevant to his hostile work environment claim.

is a sufficient nexus between the harassment experienced by the plaintiff and the other employees and if the plaintiff can demonstrate that he was aware of the harassment of other employees and was detrimentally affected by it. Velez v. QVC, Inc., 227 F. Supp. 2d 384 (E.D. Pa. 2002).

In considering whether a sufficient nexus between the harassment experienced by Plaintiff and that experienced by other co-workers has been established, a court may consider factors such as:

> (1) whether the discriminatory acts directed at others were undertaken by the same decision maker who is alleged to have discriminated against plaintiff, (2) whether the acts directed at plaintiff and those directed at other employees occurred in close temporal proximity, and (3) whether the type of discrimination complained of by plaintiff and that directed at other employees is similar in nature or kind. In other words, could a reasonable jury conclude that under the circumstances the discrimination of which the plaintiff complains is sufficiently similar in time, nature, and kind to that suffered by other employees to disclose the perpetrator's signature.

Id. at 412.

In the instant case, the type of discrimination allegedly experienced by Plaintiff, namely inappropriate, racially charged comments and discriminatory shift assignments, is entirely different from the discrimination allegedly experienced by Hispanic applicants who were denied positions with the company.[13]    Thus,

---

[13] Indeed, because these employees were never employed by Defendant, they obviously were not subjected to any workplace harassment, and they would have no claim based upon a hostile

there is nothing in the record which establishes a relationship between the failure to hire these applicants and the work environment that Plaintiff was subjected to.

The nexus between the termination of Jose Nieves and Plaintiff's hostile working environment is even more tenuous. Indeed, Plaintiff admitted in his deposition that he had only seen Mr. Nieves on a couple of occasions at the company, had never spoken with him, had only heard from someone that Nieves had been fired, and did not know why he was fired. (Pl's Mem Ex. 1 at 179-80).  Plaintiff has not presented any other evidence which indicates that Mr. Nieves' termination had any detrimental affect on him, psychological or otherwise.  Thus, Plaintiff's allegations with respect to Defendant's treatment of Jose Nieves and its refusal to hire other Hispanic applicants is not relevant to Plaintiff's hostile work environment claim.

Plaintiff points to other incidents which he claims contributed to his hostile work environment.  First, Plaintiff asserts that his discriminatory shift assignments, including the failure to assign him to the Marmora route and grant him weekend overtime shifts, contributed to and were a part of his hostile work environment.  Second, Plaintiff asserts that the failure to allow him to use vacation time to visit his sick relative contributed to

work environment.

his hostile work environment.  Finally, Plaintiff supports his hostile work environment claim with evidence that Mr. Ortlieb temporarily assigned an older, poorly functioning tractor to him and Ted Sinclair, who is African American, for the purpose of harassing them.[14]  This tractor had originally been assigned to another, white, driver, Carl Carlson, but was temporarily assigned to Plaintiff and Mr. Sinclair when Mr. Carlson was forced to go on leave due to an accident in or about September or October, 2002.  According to Plaintiff, Mr. Carlson's tractor was due to be replaced at this time, but Mr. Ortlieb refused to replace the tractor until Mr. Carlson returned from his leave in October, 2002.  (Pl's Mem. Ex. 6).  Plaintiff asserts that, among other problems, this trailer did not have working air conditioning.  Id.

When the record is considered as a whole, a jury could determine that Plaintiff had established all of the elements in Kunin, and his hostile work environment claim therefore survives summary judgment.  First, Plaintiff has alleged that only he and other minority employees were subjected to the unfavorable shift and tractor assignments that Plaintiff complains of.  This fact, along with the comments uttered by Mr. Ortlieb, allows an inference that

---

[14] Defendant argues that this claim should not be considered, because it occurred in September and October of 2001, after the EEOC charge had been filed.  However, as long as the new allegations are within the scope of the original EEOC charge, courts may consider conduct which occurs after the charge is filed.  Catagnus v. Aramark Corp., 235 F. Supp. 2d 413, 417 (E.D. Pa. 2002).

the hostile treatment Plaintiff received was because of his race or national origin.[15] See Abramson v. William Patterson College, 260 F.3d 265, 278 (3d Cir. 1999) ("Our caselaw does not indicate that the first prong requires a fact finder to peer inside the harasser's mind.  Rather, it merely requires a showing that the offender's behavior was...based upon a protected category.")  Furthermore, although when considered in isolation none of the events alleged would likely be sufficient to establish that the discrimination was pervasive and regular, a jury considering the evidence as a whole could so find. See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir. 1999)("Courts should not consider each incident of harassment in isolation.  Rather a court must evaluate the sum total of abuse over time.")  Plaintiff alleges that he was subjected to repeated mistreatment, including being forced to drive in an un-air conditioned trailer for as long as two months and being denied the right to take vacation time that others were granted.  A jury could therefore determine that a reasonable person in his position would have been affected by the treatment he received.  Furthermore, because this treatment occurred at the hands of his supervisor, a

---

[15] Defendant argues that Mr. Ortlieb's comment concerning Martin Luther King Day did not specifically reference Hispanics, and there is no other evidence that Defendant discriminated against Plaintiff because of *his* national origin.  However, because the comment was made directly to Plaintiff, and because Plaintiff alleges that he and other Hispanic, as well as African American, drivers, were subjected to Mr. Ortlieb's harassment, he has produced sufficient evidence for an inference that the treatment he received was because of his national origin.

jury could determine that respondeat superior liability attached. See Faragher, 524 U.S. at 808.[16]   Defendant's Summary Judgement Motion with respect to Plaintiff's hostile work environment claim is therefore denied.

An appropriate order follows.

---

[16] Defendant asserts the affirmative defense established in Faragher for actions undertaken by a supervisor which do not constitute adverse employment actions.  Faragher, 524 U.S. at 808.  Defendant, however, is not entitled to summary judgment on this issue.  The Faragher defense requires Defendant to prove both that it exercised reasonable care to prevent and promptly correct the harassing behavior and that Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. Id. at 807.  In the instant case, there is evidence in the record that Plaintiff complained to Defendant's human resources department about one of Mr. Ortlieb's comments, and, furthermore, filed complaints with his union about Mr. Ortlieb's shift and tractor assignments.