IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSE CABRAL : | |
| : | |
| **Plaintiff** : | |
| : | |
| v. : | Civil Action No. 02-CV-2806 |
| : | |
| THE PHILADELPHIA : | |
| COCA-COLA BOTTLING COMPANY : | |
| : | |
| **Defendant** : | |

**DEFENDANT'S PRETRIAL MEMORANDUM**

Defendant, The Philadelphia Coca-Cola Bottling Company ("PCCBC"), submits the following pretrial memorandum pursuant to the Court's Scheduling Order and Local Rule 16.1(c):

**1. Nature Of The Action**

Plaintiff Jose Cabral claims that Defendant intentionally has discriminated against him because of his ethnicity, i.e., Hispanic. He brings his suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 (e) et seq. and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Pursuant to the Court's Memorandum Opinion and Order of March 18, 2003, granting in part and denying in part defendant's motion for summary judgment, the following claims remain for trial:

(a) Whether Defendant intentionally discriminated against Plaintiff by scheduling him for overtime on Fridays so that he would be disqualified for Saturday overtime work;

(b) Whether Defendant intentionally subjected Plaintiff to a hostile work environment because he is Hispanic; and

(c) Whether Defendant terminated Plaintiff on June 22, 2001 in retaliation for his filing a charge of discrimination with the EEOC on December 13, 2000.

The remaining allegations in his Complaint have been dismissed by the Court's above-referenced Memorandum Opinion and Order.

## 2. Counter-Statement Of The Facts

**Route Assignments**

**a.** When, based upon the production schedule in the Moorestown plant, there is a need for Transport drivers to work on the weekend, voluntary and mandatory overtime sheets are posted, usually on the Wednesday before that weekend. Drivers may volunteer for overtime by signing up for the day (Saturday and/or Sunday) and start time they prefer. Overtime assignments are then awarded to the drivers who volunteered in the order of their seniority. If a sufficient number of drivers do not volunteer, the mandatory sheet shows who must work overtime in order of reverse seniority. Based upon the two sheets, the weekend overtime schedule of which drivers will be working is determined and posted around noon on Friday. United States Department of Transportation ("DOT") regulations affect the weekend overtime assignments in two ways.

First, drivers who work a Friday shift must have at least eight hours off before starting a Saturday overtime shift. Thus, a driver who finishes his shift late Friday night may not be eligible to work a Saturday overtime shift starting early in the morning.

Second, DOT regulations generally limit the number of hours a driver may drive to 60 hours per week. Drivers often accumulate overtime hours during the five-day week. Accordingly, pursuant to the week's schedule, by the end of Friday drivers must have sufficient hours left below 60 to enable them to work one or two full eight-hour shifts on the weekend without exceeding 60 hours of driving for the week to be eligible for overtime.

**b.** Daily driving assignments to Philadelphia and Marmora are made based upon the objective needs of the production and delivery schedules of the respective facilities without regard to the ethnicity or race of the Transport drivers. (Summary Judgment for the Defendant was granted as to this claim and Defendant has filed a motion in limine to bar Plaintiff from offering testimony on this issue). Similarly, weekend overtime assignments are made based solely on seniority and the DOT regulations and without regard to the ethnicity or race of the drivers.

**c.** The December 16, 2000 weekend overtime episode had nothing to do with Plaintiff's ethnicity. As of the time the weekend schedule was set for that week, Cabral and others were scheduled to work ten hours on Friday. Given that schedule, Cabral did not have sixteen hours left in the week to be scheduled for both Saturday and Sunday overtime. Therefore, he was scheduled for Sunday, the better day because it was paid at an overtime rate of "double time." As it turned out, he left work early on that Friday night after eight hours, instead of ten. In theory, this would have left him with enough time to work Saturday as well, but by the time that was known late Friday night, the Saturday schedule had been announced to all the other drivers (around noon on Friday) and it was too late to change it either under the collective bargaining agreement or logistically. Thereafter, Cabral filed a grievance predicated on the assertion that a less senior driver had received the Saturday overtime, not based on an allegation of discrimination. Initially, the grievance was denied for the above-described reasons. Subsequently, Mr. Fonseca resolved the grievance with the Local 676 Business Agent by paying Cabral overtime for Saturday as well on the theory that, in hindsight, because Cabral had been released after eight hours on Friday, he would have been able to work the full Saturday shift. This made Cabral whole and no aspect of the episode had anything to do with his ethnicity.

**d.** The weekly, Transport driver, hours-worked logs for 2001 and 2002 (see Exhibits D-26 and D-27) demonstrate that there is no basis for Cabral's claim that he is assigned more overtime on Fridays to prevent him from working Saturday. Thus, the records show that of 53 Fridays during that period when Cabral worked and when there was overtime worked by anyone on the following day (Saturday), he worked eight hours on 51 of them and worked more than eight hours only twice. On both of those occasions, Cabral also worked an overtime shift on Saturday. Similarly, of the 51 Fridays when he worked only eight hours, he worked an overtime shift on Saturday 43 times. Situations where drivers cannot work Saturday or Sunday overtime because they already have accumulated too many hours during the week occur with all drivers. As shown above, it never happened to Cabral in 2001 or 2002. Indeed, other than the December 16, 2000 episode Cabral complained of when he was ultimately paid for the Saturday for which he had not been scheduled, it apparently did not happen to Cabral at all.

**e.** Esteban Roche was not discriminated against with respect to overtime assignments. The grievances he filed were found to be without merit under the provisions of the Local 676 agreement. In fact, in the year 2000, Roche had higher earnings than seven of the twelve Transport drivers (including four with greater seniority). Of the four Transport drivers with higher earnings, three had greater seniority than he. In 2001, Roche had the highest earnings of all the Transport drivers. In 2002, he again had the highest earnings of all the Transport drivers.

**f.** Pursuant to the Local 676 contract, mandatory weekend overtime must be assigned in order of reverse seniority (i.e., least senior first). The fact that someone is on personal leave on Thursday and Friday, does not exclude them from being assigned "mandatory" Saturday overtime. Cabral was warned that this could happen to him on the weekend in question (the only such instance he complains of). In order to secure a sufficient number of drivers for that

Saturday, Cabral had to be put on the mandatory list so that more senior drivers could then also be put on the mandatory list. When Cabral did not appear after Ortlieb called his home to alert him, he received an absence "occurrence" under the union agreement's absence policy. He suffered no adverse employment or economic consequences as a result of receiving the occurrence. Had he not been put on the mandatory list, the more senior drivers required to work could all have filed grievances.

**Retaliatory Termination**

    **a.** Cabral filed his EEOC discrimination charge on December 13, 2000. Cabral requested leave in May of 2001 under the Family Medical Leave Act ("FMLA") to go to Miami, Florida with his wife to visit his sick sister-in-law. He was advised that his reason for the requested leave did not qualify under FMLA, but that he could take the time off to go to Florida by using a combination of his available, "sick personal" leave days and absence "occurrences" for the rest of the time. Upon his return, there ensued an ongoing discussion wherein Cabral sought various ways to reduce the number of occurrences he would receive as a result of his time off (he never suffered any adverse employment or economic consequences from the occurrences he did receive).

    **b.** A multiple-day absence can be reduced to one "occurrence" under the absence policy if a Doctor's excuse is submitted covering the days. Similarly, to be paid for a holiday, an employee must work the scheduled work days immediately before and after the holiday, unless he misses either day due to a 'proven illness." Apparently in an effort to avoid an "occurrence" and to qualify himself for pay for the Memorial Day holiday (May 28th), Cabral asked Ortlieb if he could submit a Doctor's excuse for his absences, which were prior to the holiday. Given the

possibility that Cabral may have undergone legitimate medical treatment during his absence, he was told he could present a Doctor's note if he had one.

However, when he eventually submitted a note from a Dentist it raised questions on its face because it purported to show that he was in Philadelphia having, and recovering from, oral surgery on the same days when he was thought to be in Miami. When asked about the apparent inconsistency, Cabral sought to maintain the contradictory position that he had been in Miami, but that the Dentist's note was a valid excuse. He was suspended with intent to terminate because he admitted that he knowingly had procured and presented a note which represented that he had undergone oral surgery on particular days in Philadelphia when, in fact, he was in Miami (subsequently, he admitted the surgery had taken place three weeks earlier than the dates indicated on the note). No one from PCCBC or the Union directed him to procure and provide a false medical excuse. He was simply given the opportunity to submit a valid one if, in fact, he had one. Neither his filing of a discrimination charge with the EEOC nor his ethnicity had anything to do with the termination decision.

**Hostile Work Environment**

    **a.**  Several of the matters discussed in this section of Plaintiff's factual statement have been ruled by the Court not to establish any proof or inference of a hostile work environment and are included, with other matters, in Defendant's motion <u>in limine</u> to preclude such testimony (see subparagraph c. below). Alleged remarks by coworkers were not reported by Cabral to PCCBC managers or Human Resources. Cabral alleges two isolated remarks by Joe Ortlieb, his Supervisor. Ortlieb did not make any remark about Martin Luther King Day. Even if made, any such remark about whether the day should be a holiday, even if insensitive, had nothing to do with Cabral's Hispanic ethnicity. The other remark, about Cabral going back where he came

from, was, by Cabral's admission, a reference to Cabral's prior employer, not about his ethnic background. Cabral was complaining about a change in PCCBC's benefit plan and Ortlieb said, in essence, if you are unhappy with it, go back to your former employer. Supervisor Moore did not make any harassing or discriminatory remarks to Cabral.

    **b.** The assignment of the new tractor was based upon seniority. It was not scheduled to go to Mr. Carlson, as Cabral alleges. It and others were assigned based upon seniority and went to drivers more senior than Cabral or Carlson.

    **c.** The allegations regarding the non-hiring of six Hispanics, the termination of Jose Nieves for accumulating too many absence "occurrences," the alleged discrimination by Ortlieb against Hispanics at a different company Ortlieb and Cabral worked for prior to PCCBC, the alleged remark about Martin Luther King Day, and alleged statements by co-workers are included in Defendant's motion in limine.

### 3. Monetary Damages Claimed

Plaintiff is not entitled to damages. Plaintiff's statement of the basis for calculating his damages is insufficient and unsupported.

### 4. Witnesses And Summary Of Testimony

    **a.** Luis Fonseca, Director of Labor Relations, PCCBC

        Mr. Fonseca will testify as to Plaintiff's grievances pursuant to the Local 676 collective bargaining agreement regarding the assignment of weekend overtime to the Transport drivers in Moorestown, New Jersey. He will also testify as to the circumstances of Plaintiff's termination and the non-retaliatory reason for his termination, i.e., his knowing and unauthorized submission of a false excuse for his absence, in an effort to obtain holiday pay and to reduce his number of

absence "occurrences."

**b**. Joseph Ortlieb, Warehouse Manager, PCCBC's SDS facility, Philadelphia

Mr. Ortlieb will testify as to the procedures for assigning weekend overtime to Transport drivers and will respond to Plaintiff's claims of being denied Saturday overtime work, being required to work mandatory overtime, and not being assigned a new truck. He will also respond to plaintiff's allegations of a hostile work environment.

**c.** Richard Andrilli, PCCBC Production Operations Supervisor, Moorestown, N.J.

Mr. Andrilli will testify as to the procedures for assigning weekend overtime to Transport drivers and respond to Plaintiff's claims as to his weekend overtime.

**d.** Tracee Hunt, Vice President of Human Resources PCCBC

Ms. Hunt will testify as to PCCBC's policies of non-discrimination, diversity training, and "open Door" for employee complaints. She will also testify as to Transport drivers' earnings.

**e.** Benjamin Folkinshteyn, Paralegal, Drinker Biddle & Reath

Mr. Folkinshteyn will testify as to the creation of Defendant's Exhibit 26, a Summary of Defendant's business records of the weekend overtime hours of Plaintiff Cabral and the other Transport drivers (Exhibit 27).

**f.** Marcus King, Local 676 Business Agent

Mr. King will testify regarding the termination of Cabral for submitting a false note from the Dentist.

**g.** Carl Carlson, Transport driver and Local 676 shop steward, Moorestown, N.J.

Mr. Carlson will testify regarding the termination of Cabral for submitting a

    false note from the dentist.

  **h.** Cliff Collins, Production operator and Local 676 shop steward, Moorestown, N.J.

    Mr. Collins will testify regarding the termination of Cabral for submitting a false

    Note from the Dentist.

**5. Defendant's Exhibits**

1. Collective Bargaining Agreement between Teamsters Local No. 676 and Philadelphia Coca-Cola Bottling Company, dated April 15, 1998 (PCC00001 to PCC00057)
2. Philadelphia Coca-Cola Bottling Company "Employee Relations Philosophy" (PCC00172 to PCC00175)
3. Haulage Department Seniority List, dated 4/15/02 (PCC00381)
4. Grievance of Jose Cabral, dated 12/18/00 (PCC00388)
5. Memo from Joe Ortlieb to Lou Fonseca and related documents. (PCC00376 to PCC00382)
6. List of Driver Start Times
7. Employee Change of Status Notice Form for Jose Cabral, dated 8/15/02 (PCC00509)
8. Employee Change of Status Notice Form for Jose Cabral, dated 8/17/02 (PCC00510)
9. Typed Notes of Lou Fonseca Regarding Jose Cabral (PCC00383 to PCC00385)
10. Personnel Warning Record for Jose Cabral, dated 5/25/01 (PCC00390)
11. Personal Attendance Warning Record for Jose Cabral, dated 11/20/01 (PCC00400)
12. Memo from Joe Ortlieb to Human Resources, dated 11/20/00 [*sic*: 11/20/01] (PCC00401)
13. Employee Change of Status Notice Form for Jose Cabral, dated 5/23/01 (PCC00523)
14. Employee Change of Status Notice Form for Jose Cabral, dated 5/23/01 (PCC00524)
15. Dentist Note for Jose Cabral from Jose N. DeCardona (PCC00391)
16. Memo from Joe Ortlieb to Lou Fonseca, dated 6/4/01 (PCC00392 to PCC00393)
17. Email from Lou Fonseca to Joe Ortlieb, dated 6/22/01 (PCC00398)
18. Memo from Joe Ortlieb to Lou Fonseca, dated 6/25/01 (PCC00395 to PCC00396)
19. Consent for Release of Confidential Information Executed by Jose Cabral (PCC00397)
20. Employee Change of Status Notice Form for Jose Cabral, effective 6/22/01 (PCC00394)
21. Employee Change of Status Notice Form for Jose Cabral, effective 6/22/01 (PCC00521)
22. Employee Change of Status Notice Form for Jose Cabral, effective 6/22/01 (PCC00522)
23. Employee Change of Status Notice Form for Jose Cabral, effective 6/13/01 (PCC00520)
24. 2000 W-2 for Jose Cabral (PCC00449)
25. 2001 W-2 for Jose Cabral (PCC00448)
26. Overtime Chart for Jose Cabral (Summary from Exhibit 27)
27. Weekly Driver Hours Logs (PCC00549 to PCC01509, PCCBC01515 to PCCBC01763)
28. (rebuttal)   Memo re new truck assignment (8/22/02)
29. (rebuttal)   Memo re new truck assignment (9/18/02)
30. Summary of Roche earnings vis' a vis' other Transport drivers - 2000, 2001, 2002
31. Transport driver W-2's - 2000, 2001, 2002

**6. Estimate Of Trial Time**

Defendant estimates the time required for trial will be <u>two to three</u> days.

**7. Legal Issues**

**a.** Defendant has filed a motion <u>in limine</u> to preclude testimony about various allegations determined to be irrelevant and/or not actionable in the Court's Memorandum Opinion and Order on Defendant's motion for summary judgment as well as additional matters alluded to in Plaintiff's Pretrial Memorandum which are irrelevant.

**8. Objections To Plaintiff's Exhibits**

Defendant notes the following objections to Plaintiff's exhibits:

| | |
|---|---|
| P-1 EEOC charge of Cabral | Hearsay, Not Relevant (will stipulate filed on 12/13/2000) |
| P-6 Roche "grievance" | Not Authenticated, Hearsay, Not Relevant |
| P-7 Roche "grievance" | Not Authenticated, Hearsay, Not Relevant |
| P-8 Cabral memo (Aug. 16, 2002) | Hearsay |
| P-11 Cabral memo (Oct. 10, 2002) | Hearsay, No foundation, Not Relevant |
| P-19 Affirmative Action Plan | Not relevant |
| P-20 Affirmative Action Plan | Not relevant |
| P-21 EEO-1 Form | Not relevant |
| P-22 EEO-1 Form | Not relevant |
| P-23 EEO-1 Form | Not relevant |

Dated: April 7, 2003                                Respectfully submitted,

                                                                          _____

                                          Gerald S. Hartman
                                          Gregory W. Homer, I.D. No. 58710
                                          Drinker Biddle & Reath LLP
                                          1500 K Street
                                          Suite 1100
                                          Washington, DC 20005
                                          202.842.8800

                                          David J. Woolf, I.D. No. 76484
                                          Drinker Biddle & Reath LLP
                                          One Logan Square
                                          18th & Cherry Streets
                                          Philadelphia, PA 19103-6996
                                          215.988.2700

                                          Attorneys for The Philadelphia Coca-Cola
                                          Bottling Company

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April, 2003, a copy of Defendant Philadelphia Coca-Cola Bottling Company's Pretrial Memorandum was served upon the following attorneys for the Plaintiff:

<u>By hand</u>:

>Robert T. Vance, Jr., Esq.
>1616 Walnut Street, Suite 709
>Philadelphia, PA 19103

<u>By first class mail, postage prepaid</u>:

>Roseann E. Weisblatt, Esq.
>Feldman & Rifkin LLP
>101 Greenwood Avenue, Suite 230
>Jenkintown, PA 19046

_____
David J. Woolf