**IN THE UNITED STATES COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JOSE CABRAL,

|  |  |  |
|---|---|---|
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Civil Action No. 02-cv-2806 |
| | : | |
| THE PHILADELPHIA | : | |
| COCA-COLA BOTTLING COMPANY, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT PHILADELPHIA COCA-COLA BOTTLING COMPANY'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendant The Philadelphia Coca-Cola Bottling Company ("Philadelphia Coca-Cola" or "the Company"), by its undersigned counsel, submits the following Proposed Findings of Fact and Conclusions of Law in advance of the April 28, 2003 trial.

I.    **PROPOSED FINDINGS OF FACT**

A.    **The Parties**

1.    Philadelphia Coca-Cola is in the business of bottling, merchandising, and delivering Coca-Cola licensed beverage products. Philadelphia Coca-Cola's main beverage production plant and warehouse are in Philadelphia on Erie Avenue. It maintains another, smaller bottling and warehouse facility in Moorestown, New Jersey.

2.    Plaintiff Jose Cabral is a current Philadelphia Coca-Cola employee. He works in the Company's Moorestown, New Jersey facility as a "transport" (also called "haulage") driver. Mr. Cabral considers himself Hispanic and that is the basis for the claims of discrimination that he brings in this case.

B.    <u>**Background**</u>

3.    Philadelphia Coca-Cola hired Mr. Cabral in or about August 1996 to work in its Moorestown, New Jersey facility as a transport driver.  Except for the brief three-month period described below, Mr. Cabral has held this position at all times since his hiring and remains employed by the Company as a transport driver today.

4.    As a transport driver, Cabral is responsible for driving a tractor-trailer from Moorestown, New Jersey to Marmora, New Jersey (the Marmora Route"); to Philadelphia, Pennsylvania (the "Philadelphia Route"); and to Langhorne, Pennsylvania (the "Langhorne Route") on an as needed and as assigned basis to pick up and deliver Company raw materials and finished product.

5.    Over the past few years, the Company has employed between 12 and 15 transport drivers at its Moorestown, New Jersey facility at any given time.

C.    <u>**The Seniority System**</u>

6.    At all times during his employment with the Company, Cabral has been a member of Teamsters, Local No. 676 ("Union").

7.    The Union and Company were and are parties to a collective bargaining agreement ("CBA") that governs the terms and conditions of Mr. Cabral's employment with the Company.

8.    Consistent with the CBA, relative seniority among the drivers dictates each driver's regular weekday start time, as well as the assignment of weekend overtime.

9.    With regard to weekday start times, the Company maintains different staggered start times for each of its drivers.  These start times, which range from 1:00 a.m. to 10:00 p.m., are bid on by the drivers and subsequently awarded to the most senior bidder.

10.    Mr. Cabral's weekday start time, which he obtained through the seniority-based bidding process, has been 2:00 p.m. or 3:00 p.m. over the last several years of his employment.

11.    With regard to weekend overtime, the Company awards weekend overtime to the most senior bidder who seeks the shift ("voluntary overtime"), as long as the bidder qualifies for the shift based on United States Department of Transportation ("DOT") regulations. Those regulations, among other things, require an eight hour minimum rest period between shifts and set a 60 hour maximum number of hours of work per week.

12.    Drivers may volunteer for voluntary overtime and express their preferences for days (Saturday and/or Sunday) and start times by completing a sign up sheet that is posted, usually on the Wednesday before the weekend.

13.    If, after attempting going through the voluntary overtime bidding process, the Company still has weekend overtime shifts available, the Company mandates employees to fill the shifts ("mandatory overtime"). The Company determines who shall fill mandatory overtime shifts through reverse seniority (*i.e.*, by assigning shifts to the least senior employee first and working its way up from the bottom of the seniority list).

14.    Based on the voluntary sign up list and, if necessary, the process of mandating drivers in reverse seniority order, the weekend overtime schedule of which drivers will be working is determined and posted at around noon on the Friday before the weekend in which the overtime is to be worked.

D.    **Philadelphia Coca-Cola's Anti-Discrimination and Open Door Policies**

15.    In addition to the seniority provisions discussed above, the CBA contains an anti-discrimination provision that provides in relevant part:

> There shall be no discrimination by the EMPLOYER ... against
> any employee because of his race, color, creed, sex, age or
> nationality, in the placement and retention of employment or in the
> hours, wages, or working conditions of the employees.

16. The CBA also contains grievance and arbitration provisions that give each employee access to a complaint resolution procedure in the event he or she believes that the Company has violated any CBA provision, including the anti-discrimination provision.

17. Additionally, the Company maintains an anti-discrimination and anti-harassment policy applicable to all employees, including union employees. This policy is posted in each of the Company's facilities, including the Moorestown facility.

18. The Company also maintains an open door policy, pursuant to which any employee may speak with his supervisor or a human resources professional concerning any workplace issue or concern.

19. At all relevant times, Mr. Cabral has been aware of the anti-discrimination provision in the CBA, the grievance and arbitration procedure, the Company's anti-discrimination and anti-harassment policy, and the Company's open door policy.

**E.    Plaintiff's Claims**

20. Mr. Cabral alleges that Philadelphia Coca-Cola violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, ("Title VII") and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") in three separate respects.[1]

21. First, Mr. Cabral alleges that he was discriminated against based on his national origin (Hispanic) in the assignment of weekend overtime.

---

[1]    Mr. Cabral's remaining claims were dismissed by the Court in its March 18, 2003 Memorandum Opinion and Order.

22.     Second, Mr. Cabral maintains that the Company unlawfully retaliated against him after he filed an Administrative Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on December 13, 2000.

23.     Third, Mr. Cabral claims that the Company subjected him to a hostile work environment based on his Hispanic national origin.

### 1.     Plaintiff's Denial of Overtime Claim

24.     Although not alleged in the Complaint or the EEOC Charge of Discrimination that Mr. Cabral filed, Mr. Cabral now asserts that he was discriminated against in the assignment of weekend overtime shifts.

25.     Specifically, Mr. Cabral claims that the Company frequently added extra hours to the end of his Friday shifts.  The Company did so, Mr. Cabral maintains, in order to make him ineligible for Saturday and/or Sunday overtime because, with the longer Friday, Mr. Cabral would either not have the DOT mandated eight hours off between his Friday and Saturday shifts or would work more than 60 hours over both weekend days and thereby exceed the DOT regulations maximum of 60 hours per week.

26.     Mr. Cabral offers only one example of purported manipulating of his Friday hours by the Company.

27.     He contends that, in December 2000, the Company assigned him to a 10 hour Friday shift that ended at 12 midnight.  The intended effect, Mr. Cabral maintains, was that he was would be ineligible to work on Saturday because he either did not have enough time left under the DOT maximum hour cap or because the Saturday shift started too early for him to take the requisite eight hours off between shifts.

28.    Ultimately, Mr. Cabral was sent home at 10:00 p.m. on the Friday at issue and, he was, as a technical matter, eligible to work on both Saturday and Sunday.  However, since the Company did not know of Mr. Cabral's availability until after he went home late Friday evening, it was too late to include him on the Saturday schedule, which had been finalized by noon on Friday based on the assumption that Mr. Cabral would work until midnight that day.  As a result, Mr. Cabral worked only on Sunday that weekend.

29.    Mr. Cabral filed a grievance with the Union over the fact that he was not scheduled for Saturday.  Mr. Cabral did not mention his national origin or otherwise allege that he was discriminated against by the Company in the grievance.

30.    In recognition of the fact that, technically speaking, Mr. Cabral was eligible to work on Saturday and, based on his seniority, would have received one of the available Saturday shifts had he sought it, the Company resolved the grievance by paying Mr. Cabral for eight hours at the overtime rate.

31.    Accordingly, Mr. Cabral suffered no harm as a result of the one incident he cites.

32.    The evidence demonstrates that the purported incident cited by Mr. Cabral was not only harmless, but also far from typical.

33.    The Company's records indicate that, in 2001 and 2002, Mr. Cabral worked more than eight hours on the Friday preceding a Saturday in which overtime was available only twice out of 53 total Fridays he worked.

34.    The records further indicate that, on each of these two occasions, Mr. Cabral worked a full day of overtime the next day, Saturday.

35.    Similarly, out of the 51 Fridays when Mr. Cabral worked only eight hours, he worked an overtime shift on Saturday 43 times.

36.    The Company's records also demonstrate that it is common for management to extend driver shifts to meet business needs, both on Fridays and other days of the week, irrespective of the driver's national origin.

37.    The records indicate that it is also common for transport drivers, regardless of national origin, to be ineligible for one or both of the weekend overtime shifts because they worked too many hours during the week, including on Friday.

38.    Further, Mr. Cabral's reliance on the Company's purported treatment of Esteban Roche, the other Hispanic transport driver at Moorestown, does not advance his claim.

39.    In 2000, Mr. Roche had higher earnings than seven of the 12 transport drivers, including four with greater seniority.  Of the four with higher earnings, three had greater seniority than Mr. Roche.

40.    In 2001 and 2002, Mr. Roche, despite being in approximately the middle of all drivers in terms of relative seniority, had the highest earnings of all transport drivers.

41.    Accordingly, there is no evidence that Mr. Cabral was ever discriminatorily denied weekend overtime through the manipulation of his Friday schedule, the assignment of extra hours, or otherwise.[2]

---

[2]    Mr. Cabral also claims that the Company discriminated against him with respect to weekend overtime scheduling by assigning him to work on one Saturday when he had not worked the preceding Thursday and Friday and was known to be out of town.

The evidence demonstrates that the Company mandated Mr. Cabral for Saturday work because it was required to do so pursuant to the CBA-based seniority provisions before moving onto the next, more senior driver and not because of any animus directed towards Mr. Cabral.

2.    **Plaintiff's Retaliation Claim**

42.    Mr. Cabral alleges the Company retaliated against him after he filed an EEOC Charge of Discrimination against the Company on December 13, 2000.

43.    The claim has its genesis in an April 2001 request by Mr. Cabral to Luis Fonseca, Philadelphia Coca-Cola's Director of Labor Relations, for one week of unpaid leave in May 2001 under the Family Medical Leave Act ("FMLA leave") in order to visit his sick sister-in-law.

44.    Mr. Fonseca denied Mr. Cabral's request for leave under the FMLA because the leave did not relate to an immediate family member and thus was not FMLA qualifying. However, Fonseca told Cabral to take the time off as "personal days" to the extent that he could and that, at any rate, he would be able to take the time.

45.    With the Company's blessing, Mr. Cabral went to and remained in Florida during the entire week of May 20, 2001.

46.    To account for his absence under the CBA, the Company allocated May 21st and 22nd as personal days and offered to allocate May 23rd, 24th, and 25th as "sick personal days."

47.    Mr. Cabral responded that he would prefer to allocate the 24th and 25th as "occurrences" under the Company's attendance policy – days in which an employee calls out for missing work without using a sick personal, personal or vacation day – so that he would not use up all of his sick personal days.[3]

---

[3]    The Company could not allocate May 24 and 25 to personal days because another, more senior employee also sought to take those days off as personal days, and Company policy prohibits multiple transport drivers from taking the same personal day off while the plant is running. It also could not allocate the days to vacation because Cabral was out of vacation time

(continued…)

48.     As a result, the Company classified May 23rd as a sick personal day and May 24th and 25th as occurrences.

49.     Subsequently, Mr. Cabral sought to limit the number of occurrences for which he was charged as a result of his absence.[4]  He also sought to get paid for the Memorial Day holiday that followed his week in Florida.

50.     The Company's attendance policy provides that an employee who presents a doctor's note covering a period of absence is given only one occurrence for the absence, even if the absence is of more than one day's duration.  The policy also provides that an employee must work both the day before and the day after a holiday in order to be paid for that holiday, unless a valid note has been submitted.

51.     As a result, Mr. Cabral asked Mr. Ortlieb if he could submit a doctor's excuse.  Given the possibility that Mr. Cabral may have undergone legitimate medical treatment during his absence, Mr. Ortlieb told Mr. Cabral that he could present one.

52.     Mr. Cabral thereafter submitted a note from his dentist that stated that he had had periodontal surgery in Philadelphia on May 23rd and was out of work from May 23rd to May 25th as a result.

53.     Mr. Cabral knew when he submitted the note that it was false, that he was in Florida at the time, and that he did not have surgery on May 23rd.

---

(..continued)

at that point.  Classifying the two days as occurrences did not result in Cabral experiencing a loss of pay, alteration of duties, or other penalty.

[4]     According to the CBA, three occurrences within a seven-month period results in a "written warning" to the employee.  However, a written warning does not carry a loss of pay or benefits or other meaningful penalty to the employee.

54.    After receiving the note, Mr. Fonseca, thinking that perhaps Mr. Cabral had spent only part of the week in Florida and had returned to have the surgery in Philadelphia later in the week, arranged a meeting between himself, Mr. Cabral, and Cliff Collins, the Union shop steward.

55.    At the meeting, Mr. Fonseca asked Mr. Cabral if he was in Florida during the entire week of May 21, 2001.  Mr. Cabral responded that he was.

56.    Mr. Fonseca then asked Mr. Cabral how it was that he could be in two places at the same time.  Mr. Cabral never answered the question, but merely responded that he was telling the truth.

57.    On June 22, 2001, based on Mr. Fonseca's recommendation, the Company terminated Mr. Cabral for falsifying documents submitted to the Company.

58.    Cabral subsequently complained to the Union about his termination, and the Union grieved it on his behalf.  Ultimately, the matter was reviewed by the Joint Local Committee, which reduced Cabral's termination to a suspension and returned him to work on September 13, 2001 without back pay.

59.    Plaintiff received $870 in unemployment insurance benefits and at least $7,000 from other employers during his almost three month suspension from Philadelphia Coca-Cola.

### 3.    Plaintiff's Hostile Work Environment Claim

60.    In support of his hostile work environment claim, Mr. Cabral alleges (a) that he was subjected to two offensive comments by Joe Ortlieb, his supervisor, (b) that he was discriminated against with respect to route and weekend overtime assignments, (c) that the Company refused to allow him to use personal days to visit sick relatives, and (d) that the

Company did not replace the older tractor that he drove for approximately two months while substituting for another driver who was out on medical leave.[5]

### a.    The Purported Ortlieb Comments

61.    Plaintiff alleges that his supervisor, Joe Ortlieb, made two comments that, either on their own or together with other events, created an actionable hostile work environment.

62.    Mr. Cabral first alleges that, as he was speaking with a co-worker about his dissatisfaction with a change in the Company's health insurance benefits, Mr. Ortlieb joined the conversation and told Mr. Cabral, "if you don't like it, why don't you go back where you came from."  Mr. Ortlieb then added, "go back and make the $2,000 a week you were making before."

63.    Mr. Cabral also alleges that, in early 2000, when Mr. Ortlieb was new to the department, he asked Mr. Cabral why he was taking a Monday in January off.  Mr. Cabral replied that it was Martin Luther King Day.  Mr. Cabral maintains that Mr. Ortlieb then allegedly stated, "If you ask me, you guys are having too many holidays" and allegedly asked, "Who is Martin Luther King."

64.    There is insufficient evidence to establish that Mr. Ortlieb made either of the two comments attributed to him by Mr. Cabral.

65.    Further, even if made, the purported "go back where you came from" remark had nothing to do with Mr. Cabral's national origin and does not indicate national origin

---

[5]    Mr. Cabral has also attempted to introduce evidence concerning purported "racist comments" made by co-workers, the Company's failure to hire Hispanics, and the Company's treatment of Jose Nieves.  However, the Court, in its March 18, 2003 Memorandum Opinion and

(continued…)

animus. Rather, according to Mr. Cabral himself, Mr. Ortlieb was referring to Mr. Cabral's previous employer.

66.    Additionally, the Martin Luther King Day comment, at most, indicates animus with respect to issues of race. Even as to racial animus, the remark is ambiguous and capable of an entirely benign interpretation. It certainly does not show animus with respect to Mr. Cabral's national origin.

67.    Mr. Cabral did not complain to his supervisor, other management personnel or anyone in Philadelphia Coca-Cola's Human Resources Department about the "go back where you came from" comment.

### b.    Purported Discrimination Concerning Shift Assignments

### i.    The Marmora Route

68.    Mr. Cabral also claims that, of the three main routes available to the transport drivers, he has was assigned his preferred route, the Marmora route, less frequently than he would have liked, and that the Company's doing so created a hostile work environment.

69.    There is no difference in compensation between the three routes, and Mr. Cabral has suffered no financial harm as a result of the routes to which he has been assigned.

70.    Further, the routes to which Mr. Cabral was assigned did not detrimentally affect Mr. Cabral, alter the terms and conditions of his employment, or unreasonably interfere with his work performance.

71.    No driver is assigned exclusively to one route and those who drive their first run of the day to Marmora often do their second run to Philadelphia and vice versa.

---

(..continued)
Order, held that the none of these allegations can form the basis of such a claim. <u>See</u>

(continued…)

72.    The Company assigns routes on a daily or hourly basis based on production needs and as supervisors in the Moorestown transport area are notified of the need for a delivery to or pickup from a particular location.

73.    Typically, when the need arises to make a delivery to Marmora, the Company assigns the route to the next available driver, assuming that the driver has non-overtime hours available and another, more pressing need does not arrive in the interim.

74.    The evidence demonstrates that Mr. Cabral drove the Marmora route with regularity.

75.    The evidence also demonstrates that the assignment of routes to Mr. Cabral was consistent with the neutral method of assignment employed by the Company, and there is no evidence to suggest that the Company discriminated against Mr. Cabral in assigning him routes.

### ii.    The Assignment of Weekend Overtime

76.    For purposes of his hostile work environment claim, Mr. Cabral repeats his allegation concerning the assignment of weekend overtime hours.

77.    As set forth above, there is no evidence that Mr. Cabral was ever discriminatorily denied weekend overtime.

### c.    Mr. Cabral's Contention that He Was Not Allowed to Use "Personal Days" When He Went to Florida

78.    Mr. Cabral further alleges that he was not permitted to use personal days during the week of March 21, 2000, when he went to visit his sister-in-law in Florida, and that the Company's decision in this regard contributed to the alleged hostile work environment.

---

(..continued)
Memorandum Opinion at 22-25 & fn. 12.

79.    In fact, Mr. Cabral was permitted to use personal days as to the first two days of that week – May 21st and May 22nd – and there is no dispute that he did use personal days on those dates.

80.    Mr. Cabral could not use personal days for the remainder of the week – May 23rd, 24th, and 25th – because a more senior employee had already requested those dates off, and Company policy prohibited multiple employees from using personal days when the plant was is running.[6]

81.    Instead, Mr. Fonseca offered Mr. Cabral the option of using sick personal days, instead of personal days.  Using sick personal days would have had the same effect as using personal days insofar as Mr. Cabral would have been able to take the days off without receiving an occurrence.

82.    Mr. Cabral eventually accepted Mr. Cabral's offer to use a sick personal day on May 23rd, but voluntarily elected not to use sick personal days for May 24th or 25th. Instead, Mr. Cabral opted to classify those days as occurrences.

83.    There is no evidence to suggest that the Company's handling of Mr. Cabral's leave request was motivated by discriminatory animus.

84.    Further, there is no evidence that the Company's handling of Mr. Cabral's leave request detrimentally affected Mr. Cabral, altered the terms and conditions of his employment or unreasonably interfered with his work performance.

---

[6]    Mr. Cabral alleges that other, Caucasian employees were permitted to use their personal days at the same time as another Caucasian employee.  However, the evidence demonstrates that, at the time the Company permitted the other employees to use their personal days on the same day, the Moorestown facility was on shutdown.

### d.    Mr. Cabral's Claim that He was Assigned an Older Tractor

85.    Finally, Mr. Cabral contends that, while he was filling in for a more senior driver who was out of work with a medical condition for two months (Carl Carlson), he was not given a new tractor that Mr. Cabral maintains was earmarked for Mr. Carlson.  Rather, Mr. Cabral contends, the tractor was given to another, Caucasian driver.

86.    In fact, the evidence demonstrates that the new tractor at issue was awarded based on seniority.

87.    The driver who received the new tractor had greater seniority than both Mr. Cabral and Mr. Carlson.  Thus, contrary to Mr. Cabral's contentions, the tractor was never earmarked for Mr. Carlson.

88.    Accordingly, the evidence demonstrates that Mr. Cabral's national origin played no role in the allocation of the tractor.

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    Mr. Cabral's Disparate Treatment Claim Concerning Weekend Overtime

89.    Claims of national origin discrimination brought under Title VII and Section 1981 follow the familiar burden shifting framework first articulated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, a plaintiff must make out a *prima facie* case of unlawful discrimination by showing (1) that he belongs to a protected class; (2) that he requested and was qualified for a job benefit; (3) that he suffered some adverse employment action; and (4) that similarly situated non-protected persons were treated more favorably.  Johnson v. Diamond State Port Corp., No. 01-4031, 2002 U.S. App. LEXIS 23389, at *8 (3d Cir. Oct. 30, 2002); Tolani v. Upper Southampton Township, 158 F. Supp. 2d 593, 597 (E.D. Pa. 2001).

90.     Once the plaintiff establishes a *prima facie* case, the burden of production (but not the ultimate burden of proof) shifts to the defendant to provide a legitimate, non-discriminatory reason for terminating the plaintiff.  After the employer makes such a proffer, the burden returns to the plaintiff to prove that the reason articulated by the employer is a mere pretext for discrimination.  Sheridan v. E.I. Dupont de Nemours Co., 100 F.3d 1061, 1066-67 (3d Cir. 1996) (en banc); Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 580 (3d Cir. 1996).

**1.      Mr. Cabral Has Not Established a *Prima Facie* Case of Discrimination.**

91.     Even assuming *arguendo* that Mr. Cabral has established the first two prongs of the *prima facie* case test, his weekend overtime claim fails because there is no evidence that he suffered an adverse employment action or that similarly situated non-Hispanic drivers were treated more favorably.

**a.      Plaintiff Suffered No Tangible Adverse Employment Action.**

92.     Although Plaintiff has alleged that he has been harmed in terms of weekend overtime hours worked through the manipulation of his Friday schedule, he offers no evidence of such.  See Williams v. West Chester, 891 F.2d 458, 470 (3d Cir. 1989) (evidence must be admissible, not merely hearsay or conclusory allegations); Haydinger v. Freedman, Civil Action No. 98-3045, 2000 U.S. Dist. LEXIS 7924, at *12 (E.D. Pa. June 8, 2000) (conclusory allegations, improbable inferences, and unsupported speculation, insufficient to allow for judgment).

93.     In fact, the undisputed evidence establishes that Mr. Cabral suffered no harm.

94.     Mr. Cabral provides only one example of an instance in which he believes he was discriminatorily denied weekend overtime – an occasion in December 2000 when he was

Case 2:02-cv-02806-JP    Document 25    Filed 04/07/2003    Page 17 of 30

not scheduled for Saturday overtime because it was anticipated that he would work a ten hour shift on the preceding Friday and therefore be ineligible, based on total hours worked for the week, for two days of weekend overtime. Although ultimately Mr. Cabral was, as a technical matter, eligible for Saturday overtime because he was sent home early on Friday, this was not known until late Friday night, well after the weekend schedule was made.

95.    There is no evidence that the Company's scheduling of Mr. Cabral for the Friday in December 2000 was discriminatory. Further, Mr. Cabral suffered no harm as a result of this purported incident because the Company subsequently paid him for eight hours at the overtime rate, thereby making him whole.

96.    Additionally, on weeks when Saturday overtime was available in 2001 and 2002, Mr. Cabral worked more than eight hours on the preceding Friday only twice.

97.    On each of these two occasions, Mr. Cabral was assigned and worked a full day of overtime on the following Saturday.

98.    Accordingly, Mr. Cabral's weekend overtime claim fails on this basis alone.

**b.    <u>There is No Evidence That Similarly Situated Caucasian Employees Were Treated More Favorably than Mr. Cabral.</u>**

99.    Even if Mr. Cabral could demonstrate tangible harm, his weekend overtime claim would still fail because there is no evidence that similarly situated, non-Hispanic individuals were treated more favorably.

100.    The one example that Mr. Cabral cites, from December 2000, when he was scheduled to work 10 hours on a Friday, but subsequently sent home after eight hours and then made whole for an overtime opportunities he missed, does not indicate discriminatory treatment.

101.    Additionally, the undisputed evidence demonstrates that, in 2001 and 2002, the other transport drivers worked more than eight hours on Fridays much more often than Mr. Cabral did.

102.    Furthermore, the evidence indicates that many drivers, irrespective of race, were unable to work one or both weekend overtime shifts because of the hours they worked during the work week, including on Friday.

103.    Accordingly, Mr. Cabral's weekend overtime claim fails for this reason as well.

**2.    There is No Evidence that the Company's Legitimate, Non-Discriminatory Reason Assigning Mr. Cabral Friday and Weekend Work is Pretextual.**

104.    Philadelphia Coca-Cola has proffered a legitimate, non-discriminatory reason for Mr. Cabral's work schedule.  Specifically, the Company has provided evidence that its need to adhere to the United States Department of Transportation regulations, seniority and, to the extent consistent with those two criteria, business demands, dictated scheduling.

105.    Given this articulation, it is Mr. Cabral's burden to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

106.    To meet this burden, Mr. Cabral must focus on the reason proffered by the Company and demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did

not act for [the asserted] non-discriminatory reasons." Id. at 765 (internal citations and quotation marks omitted).

107.    Here, Mr. Cabral has identified only one instance of even potential schedule manipulation and, as set forth above, it is not indicative of discrimination.  Nor did Mr. Cabral suffer any harm as a result of this incident.

108.    Beyond that, Mr. Cabral has offered only conclusory allegations of discrimination with respect to weekend overtime.  This does not satisfy Mr. Cabral's burden. See Boykins v. Lucent Technologies, Inc., 78 F. Supp. 2d 402, 413 (E.D. Pa. 2000) ("[p]retext cannot be established based on speculation and mere conclusory allegations").

109.    In fact, all of the evidence indicates that Mr. Cabral's Friday and weekend overtime scheduling was consistent with the Company's legitimate, non-discriminatory reason, and judgment for the Company is proper on this basis as well.  See Billet v. CIGNA Corp., 940 F.2d 812, 828 (3d Cir. 1991) ("[w]ithout some evidence to cast … doubt [on the employer's articulated reasons for an employment decision], this court will not interfere in an otherwise valid management decision"); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) ("an employer would be entitled to judgment as a matter of law … if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred").

110.    Further, Mr. Cabral's references to Mr. Roche in an effort to establish pretext fail because Mr. Roche was clearly not discriminated against with respect to overtime. Indeed, despite being in the middle in terms of relative seniority among the drivers, Mr. Roche

was the highest earning transport driver in 2001 and 2002 and was the fifth highest out of 12 in 2000.

     **B.**    <u>**Plaintiff's Retaliation Claim**</u>

     111.    Mr. Cabral asserts in his Complaint that the Company's decision to terminate him after he submitted a falsified dentist's note amounted to unlawful retaliation.

     112.    In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) he engaged in protected activity, (2) the employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a causal link between the protected activity and the termination. <u>Weston v. Commonwealth of Pennsylvania</u>, 251 F.3d 420, 430 (3d Cir. 2001); <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920 (3d Cir. 1996).

     113.    If the plaintiff can establish a *prima facie* case, the analysis proceeds under same burden shifting framework set forth above with respect to claims of discrimination. <u>See</u> <u>id</u>. at 920 n.2.

     114.    In this case, Cabral cannot withstand summary judgment on a retaliation claim because he cannot establish a *prima facie* case or show Philadelphia Coca-Cola's proffered justification to be pretextual.

     **1.**    <u>**Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation.**</u>

     115.    Even assuming, *arguendo*, that Mr. Cabral can establish the first and second prongs of a *prima facie* case, his retaliatory termination claim fails as to the third prong – establishing a causal connection to his EEOC Charge.

     116.    Approximately six months elapsed between the filing of Mr. Cabral's EEOC Charge and his termination, which is hardly "unusually suggestive" of a retaliatory

motive.  See Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997); see also

Silvestre v. SeraCare, Inc., Civil Action No. 02-446, 2002 U.S. Dist. LEXIS 25267, at *24-29

(E.D. Pa. Dec. 30, 2002) (two month period between protected activity and termination, without

other evidence, fails to establish causal connection); Williams v. Philadelphia Housing

Authority, 230 F. Supp. 2d 631, 642 (E.D. Pa. 2002) ("no reasonable jury could conclude that the

two events shared a causal link" even though they were only two months apart); Hussein v.

Genuardi's Family Markets, Civil Action No. 00-4905, 2002 U.S. Dist. LEXIS 430, at *27 (E.D.

Pa. Jan. 15. 2002) (two months temporal proximity "is not particularly suggestive of

retaliation").

      117.    Further, Mr. Cabral has not articulated any evidence to support his

contention that the Company was motivated by retaliatory animus in terminating him for

submitting a false dentist's note.

      118.    Accordingly, Mr. Cabral's retaliation claim is unfounded as a matter of

law.  See Quiroga v. Hasbro, Inc., 934 F.2d 497, 501-02 (3d Cir. 1991) (retaliation claim rejected

because plaintiff "presented only his subjective belief, but absolutely no supporting evidence that

Hasbro's motives were improper"); Phillips v. Dalton, No. 94-CV-4828, 1997 U.S. Dist. LEXIS

419, at *19 (E.D. Pa. Jan. 22, 1997) ("mere allegation of the causal connection … insufficient").

      **2.**     **Even If Plaintiff Could Establish a *Prima Facie* Case of Retaliation,
His Claim Would Still Fail Because He Cannot Show that
Philadelphia Coca-Cola's Proffered Justification Was Pretextual.**

      119.    Philadelphia Coca-Cola maintains that it terminated Mr. Cabral because he

went to his dentist; asked the dentist to prepare a falsified note saying he was having periodontal

surgery in Philadelphia when, in fact, he was in Florida visiting relatives; and then knowingly

submitted the falsified note to the Company in an effort to reduce the number of occurrences in his file and to qualify for a paid holiday to which he was not entitled.

120.    No one told Mr. Cabral to produce a note from his dentist, much less a false one.

121.    Rather, Mr. Cabral asked if he could produce a note, and the Company agreed to let him do so because of the possibility that he had undergone legitimate medical treatment during his absence.

122.    Mr. Cabral, in response to Philadelphia Coca-Cola's legitimate, non-discriminatory reason, has produced no evidence from which any reasonable fact finder could conclude that the proffered justification was pretextual.

123.    Although Mr. Cabral claims that there are inconsistencies in the Company's version of events, he produced no evidence to substantiate his claim.

124.    Accordingly, judgment in favor of Philadelphia Coca-Cola would be appropriate on Mr. Cabral's retaliation claim.

**C.      Mr. Cabral's Hostile Work Environment Claim Fails.**

125.    To establish a valid hostile work environment claim under Title VII and Section 1981, a plaintiff must demonstrate (1) that he suffered intentional discrimination because of his national origin; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected him; (4) that the discrimination would detrimentally affect a reasonable person of the same national origin in that position; and (5) the existence of respondeat superior liability (either by showing that the harassing conduct was carried out by a supervisor or, in the case of co-worker harassment, that the Company knew or should have known of the harassment and failed to take corrective action).  Faragher v. City of Boca Raton,

524 U.S. 775 (1998); Weston, 251 F.3d at 426; Kovoor v. School Dist. of Philadelphia, 211 F.

Supp. 2d 614, 626 (E.D. Pa. 2002).

### 1.    Plaintiff Did Not Suffer Discrimination Because of His National Origin.

126.    Not all conduct of a hostile nature raises issues of discrimination under

Title VII or Section 1981.  Rather, the conduct must be "because of" the plaintiff's protected

status – here, Mr. Cabral's national origin.  42 U.S.C. § 2000e-2(a)(1).

127.    Where the conduct at issue is motivated by a factor other than the

plaintiff's protected status, it is not actionable.  See Lack v. Wal-Mart Stores, Inc., 240 F.3d 255,

262 (4th Cir. 2001) (granting judgment as a matter of law as to plaintiff's hostile work

environment claim because "the evidence compels the conclusion that [the harasser] was just an

indiscriminately vulgar and offensive supervisor" and that the harassment was not "because of"

the plaintiff's gender); Gharzouzi v. Northwestern Human Services of Pennsylvania, 225 F.

Supp. 2d 514, 534 (E.D. Pa. 2002) ("Verbal … harassment, no matter how unpleasant and ill-

willed, is not prohibited by Title VII if not motivated by the plaintiff's membership in some

protected group.") (citations omitted).

128.    With respect to the alleged comments by Mr. Ortlieb, the alleged remark

concerning the Martin Luther King Day holiday, while arguably inappropriate and insensitive,

cannot fairly be interpreted as a remark made "because of" Cabral's national origin.  See

Ngeunjuntr v. Metropolitan Life Ins. Co., 146 F.3d 464, 467 (7th Cir. 1998) ("comment about

Middle Easterners … hardly seems relevant to [the plaintiff]," who was from Thailand); Martin

v. Enterprise Rent-A-Car, Civil Action No. 00-CV-6029, 2003 U.S. Dist. LEXIS 1191, at *22

(E.D. Pa. Jan. 15, 2003) (comments about Indians and women do not establish hostile work

environment because they were did not constitute "intentional discrimination based on [plaintiff's] race or religion").

129.    As to Mr. Ortlieb's purported "go back to where you came from" comment, that comment, assuming that it was made, referred not to Mr. Cabral's national origin, but rather to Mr. Cabral's prior place of employment.  Thus, this comment, even if made, also does not support Mr. Cabral's hostile work environment claim.

130.    The other alleged events that purportedly support Mr. Cabral's hostile work environment claim – the scheduling of routes and weekend overtime, the Company's characterization of the days Mr. Cabral took off from work to go to Florida, and the awarding of the new tractor – are even weaker.

131.    As set forth above, there is no evidence that the frequency with which Mr. Cabral was assigned to the Marmora route or his weekend work schedule were tied in any way to Mr. Cabral's national origin.  To the contrary, the evidence demonstrates that they were the product of legitimate business decisions.

132.    Similarly, there is no evidence to suggest that the Company allocated two of the five days that Mr. Cabral was in Florida in May 2001 as personal days and the remaining three as either sick personal days or occurrences, depending on Mr. Cabral's preference, out of discriminatory animus.  Rather, the evidence demonstrates that the Company allocated the days based on a neutral Company policy of not allowing multiple drivers to take personal days on the same day.

133.    Finally, the evidence establishes that the tractor at issue was awarded to a Caucasian employee based on his greater seniority, not because of his or Mr. Cabral's national origin.

2.  **Even Assuming, *Arguendo*, That Plaintiff Can Establish the First Prong of the Hostile Work Environment Test, His Hostile Work Environment Claim Still Fails Because the Conduct of Which He Complains Was Not Pervasive and Regular.**

134.    "The Supreme Court emphasized that there is another requirement which prevents Title VII from expanding into a general civility code for the workplace: 'it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment.'" Weston v. Commonwealth of Pennsylvania, Civ. Action No. 98-3899, 2001 U.S. Dist. LEXIS 19185, at *18 (E.D. Pa. Nov. 20, 2001) (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)). See also Oncale, 523 U.S. at 78 ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.") (citation omitted).

135.    In determining whether this high standard is met, a court will look at a number of factors including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

136.    As set forth above, in this case, Mr. Cabral seeks to establish a hostile work environment based on the following:

- Mr. Ortlieb's alleged comment that Mr. Cabral should go back to his former employer if he was not happy at Philadelphia Coca-Cola;

- Mr. Ortlieb's comment – allegedly made when Mr. Cabral advised Mr. Ortlieb, who was new to his position, that a certain Monday was Martin Luther King Day and a holiday – that "you guys are having too many holidays" and Mr. Ortlieb's supposed asking, "who is Martin Luther King;"

- The Company's failure to assign Mr. Cabral to the Marmora route as much as he would like and its supposed manipulating of his Friday hours so as to adversely impact his availability for weekend overtime;

- The Company's offer that Mr. Cabral use sick personal days, instead of personal days, during the week he went to Florida; and

- The assignment of a new tractor, over a two-month period that Mr. Cabral was acting as a substitute driver, to a Caucasian driver rather than Mr. Cabral.

137. These contentions, even if true, are simply not enough to meet the "pervasive and regular" standard.

138. With regard to the two purported Ortlieb comments, as discussed above, even if they were made, they are not indicative of national origin animus.

139. Further, even if related to Mr. Cabral's national origin, the law is clear that two offensive comments do not establish a hostile work environment. See West v. Philadelphia Electric Co., 45 F.3d 744, 753 (3d Cir. 1995) (noting that a mere offensive utterance does not establish hostile work environment claim); Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994) (to establish a hostile work environment claim, "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments"); Gharzouzi, 225 F. Supp. 2d at 534-36 (six alleged incidents of harassment over several months insufficient as a matter of law to establish hostile work environment claim because "inappropriate, racial comments that are sporadic or part of casual conversation do not violate Title VII") (internal quotations omitted); Bishop v. National Railroad Passenger Corp., 66 F. Supp. 2d 650, 665 (E.D. Pa. 1999) ("several degrading and offensive remarks to plaintiff" by co-worker does not create a hostile work environment); Maher v. Assoc. Services for the Blind, 929 F. Supp. 809, 813 (E.D. Pa. 1996) ("Title VII does not protect a plaintiff who experiences conduct that is merely offensive or annoying").

140.    The three other alleged incidents that purport to support Mr. Cabral's claim – the scheduling of routes and weekend overtime, the classification of Mr. Cabral's time off, the assignment of the new tractor to another employee during a two month time period – do not elevate the purported discrimination to "pervasive and regular" for several reasons.

141.    First, a hostile work environment claim is not a catch-all for claims based on supposed events that were unrelated to the work environment, which are primarily of an economic impact, or which were not directed at the plaintiff.  The hostile work environment cause of action was created as a result of the Supreme Court's recognition that Title VII not only protects employees from discriminatory tangible employment actions, but also provides employees with the "right to work in an environment free from discriminatory intimidation, ridicule and insult."  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986).  It is harassment that is of concern in such claims – in particular, harassment that is of such a severe and pervasive nature that it effectively alters the terms and conditions of the plaintiff's employment.  Weston v. Pennsylvania, 251 F.3d 420 (3d Cir. 2001).  See also Burke v. Sears-Roebuck Co., Civil Action No. 98-4364, 1999 U.S. Dist. LEXIS 8243, at *5 (E.D. Pa. June 2, 1999) ("A hostile work environment claim arises when 'the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'") (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998)).  Thus, the allegations made by Mr. Cabral, on their face, do not support his hostile work environment claim.

142.    Second, there is no evidence to suggest that these three purported events altered the conditions of Mr. Cabral's employment or created an abusive working environment.

143.    As discussed above, the Company's assignment of routes and weekend overtime to Mr. Cabral neither had an adverse economic impact on him, nor detrimentally affected the work environment.

144.    Further, the Company's insistence that Mr. Cabral use sick personal days or classify his absences as occurrences, rather than personal days, had no impact on him whatsoever.  Under either scenario, Mr. Cabral was permitted to go to Florida without suffering any harm or loss.

145.    Finally, Mr. Cabral's tractor assignment claim, even if true, could not be regular and pervasive because it impacted him for at most two months – the length of his temporary assignment.  There is no dispute that, once the injured driver returned, Mr. Cabral was properly returned to his own shift to drive his own truck.

### 3.    Even Assuming, *Arguendo*, That Plaintiff Can Establish the First and Second Prongs of the Hostile Work Environment Test, His Hostile Work Environment Claim Still Fails Because He Was Not Detrimentally Affected.

146.    The evidence demonstrates that Mr. Cabral has not been harmed by any of the conduct about which he complains and which he maintains support his hostile work environment claim.

147.    At no time has Mr. Cabral sought treatment from a medical provider as a result of his experiences at work and there is no evidence that he was detrimentally affected by any of them.

148.    Further, there is no evidence that Mr. Cabral was harmed financially as a result of the events about which he complains.

149.    Additionally, in light of the amount of Mr. Cabral earned from other employers during the period of his suspension, any claim for damages is too speculative to merit the award of further damages.

150.    Accordingly, Mr. Cabral's hostile work environment claim fails on this basis as well.

Respectfully submitted,

Dated:  April 7, 2003

_____

Gerald S. Hartman
Gregory W. Homer, I.D. No. 58710
DRINKER BIDDLE & REATH LLP
1500 K Street, Suite 1100
Washington, DC 20005
(202) 842-8800

David J. Woolf, I.D. No. 76484
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA  19103
(215) 988-2700

Attorneys for The Philadelphia
Coca-Cola Bottling Company

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April, 2003, a copy of Defendant Philadelphia

Coca-Cola Bottling Company's Proposed Findings of Fact and Conclusions of Law was served

upon the following attorneys for the Plaintiff:

By hand:

        Robert T. Vance, Jr., Esq.
        1616 Walnut Street, Suite 709
        Philadelphia, PA 19103

By first class mail, postage prepaid:

        Roseann E. Weisblatt, Esq.
        Feldman & Rifkin LLP
        101 Greenwood Avenue, Suite 230
        Jenkintown, PA 19046


                        _____
                        David J. Woolf